### GALLAGHER et v SQUIRE
### CLEVELAND TRUST CO et v SQUIRE et

Ohio Appeals, 6th Dist, Erie Co

Decided March 1, 1937

King, Flynn & Frohman, Sandusky, and R. R. Kruse, for appellants, J. S. Gallagher and others.

Sawyer, Cummings, Mook, Strong & Douglas, Cleveland, for appellants, The Cleveland Trust Co. and others.

Herbert S. Duffy, Attorney General, Columbus, and John F. McCrystal, Jr., Sandusky, for appellee.

## OPINION

By OVERMYER, J.

In 1925 The Commercial Banking & Trust Company of Sandusky, Ohio, was a banking corporation organized, existing and doing business as a bank with a trust department under the laws of Ohio then in force. In 1922 the bank had purchased real estate at the corner of Washington Row and Columbus Avenue in said city, and in 1924 and 1925 a bank and office building was erected thereon. When completed the land and building represented an investment of $282,793.42. At that time the paid-in capital and surplus of the bank aggregated $300,000 and therefore the sum invested in the bank building and the real estate whereon it stood exceeded 60% of the bank's paid-in capital and surplus, in violation of §710-108, GC.

The state department of banks, through the superintendent, directed that the bank take steps to comply with the law in the respects referred to, and thereupon the bank proceeded to form a trust, the corpus of which was the land and an undivided one-third interest in the bank and office building thereon, and, designating itself as trustee, on August 1, 1925, an "Agreement and Declaration of Trust" was executed between the bank and the holders of land trust certificates issued in pursuance of the agreement. The "agreement" was duly recorded in the record of deeds of Erie County, Ohio, and the certificates issued and offered to the public through the trust department of the bank, and $125,000 worth thereof were purchased by thirty-four separate purchasers.

The land trust certificates were issued by the trustee from a book in its possession, and payments for same were made to the trustee. The proceeds of the certificates sold were paid by the trustee to the bank and credited by the bank against the "Construction Account" and "Banking House and Lot Account" and by this process these accounts were brought within the limitations of §710-108, GC, as a matter of bookkeeping.

In the "Agreement and Declaration of Trust," the bank reserved to itself a 99-year, renewable forever, leasehold in the trust estate and agreed to pay all of the taxes, insurance, maintenance and other upkeep on the building and land, and to pay to the trustee a yearly rental of $6,875 in quarterly installments for the use of the building and land.

The "Agreement and Declaration of Trust" provided in Article 1, Part Two, that:

"The equitable ownership and beneficial interest in the trust estate, is divided into one hundred and twenty-five indivisible equal shares, which shares shall be represented by certificates of equitable ownership, said certificates being referred to and designated as 'Land Trust Certificates,' said certificates varying only as to the respective numbers, names of the respective beneficiaries, and the amount of the equitable interest evidenced by the number of shares represented by the certificates, in substantially the following form.

Then follows a copy of the certificates issued.

In July, 1933, the bank in question was closed by order of the state Superintendent of Banks because of insolvency and since then has been and still is in process of liquidation. The owners of the land trust certificates claim a position of preference over general creditors and the Superintendent of Banks and the Common Pleas Court having denied their claims, suits in equity were brought in Common Pleas Court by the appellant, J. S. Gallagher, and thirty-one other plaintiffs, and by The Cleveland Trust Company and others, trustees, each against the Superintendent of Banks, under §710-95, GC, to enjoin the Superintendent of Banks from carrying into effect an order of the Common Pleas Court previously made in the liquidation proceedings against the bank, which order had denied plaintiffs' claims for preference. The two suits were consolidated in Common Pleas Court and are here presented and considered together.

Upon hearing in Common Pleas Court, that court denied the prayer of the plaintiffs' petitions, denied the injunctions sought and dismissed the petitions at the costs of the plaintiffs. From this decree, the plaintiffs have appealed on questions of law and fact and the errors assigned are set forth in ten several specifications, but the substance of all of them is that the trial court was in error in holding the trust in question invalid and void under the authority of **Ulmer v Fulton, Supt. of Banks,**

129 Oh St 323, 195 NE 557, 97 A.L.R. 1170.

It is pointed out that there are many differences in the facts involved in the trust here considered from those considered by the Supreme Court in the Ulmer case, and this is quite true. For example, in the Ulmer case, securities, that is, fungible assets, were involved, here the real estate and bank building are involved; in the Ulmer case the right of substitution of securities in the trust res was reserved, here no such substitution could be made; in the Ulmer case the question of administrative orders of the Superintendent of Banks was not involved, here the record shows that the scheme and plans of the bank in attempting to comply with the requirements of §710-108, GC, were carried forward, if not at the suggestion of the Superintendent of Banks, at least with his knowledge, consent and approval; in the Ulmer case the trust was created out of the bank's own securities, fungible items, and was a profit-making enterprise, here the trust was created out of real estate, not necessarily for profit, but in an attempt to comply with a specific requirement of law, viz., to bring the bank's investment in lot and building within the requirements of §710-108, GC; in the Ulmer case "participation certificates" were issued, here "land trust certificates" were issued, which it is claimed was quite a different matter, in that here no certificates were retained by or sold to the bank or the trust department, and that the certificate holders had an interest by the terms of the agreement in the real estate itself.

But in Ulmer v Fulton, supra, the Supreme Court waves all other considerations aside as "beside the point" and lays down the unqualified rule that "the bank was **totally lacking in power or authority to create trusts out of its own property,**" and further says "we are unwilling through conjectural and dubious construction to extend to banks exercising trust prerogatives such broad and far-reaching powers as the formation of trusts out of their own property would give them, when the General Assembly has not seen fit to do so through plain and unequivocal language."

It must be conceded at the outset that the bank did an unlawful act when, with full knowledge of a statute then existing, it undertook the acquisition of real estate and the erection of a bank building which the officers knew in advance would cost such a sum as to carry the investment beyond the statutory limitations for that purpose. The purchasers of the land trust certificates were also charged with knowledge of that law and with the purposes and objects of the trust agreement, which was a matter of public record. Therefore it can not now be said that another violation of law should be tolerated to protect the certificate holders, for "two wrongs do not make a right." 8710-108, GC, is a salutary statute, enacted for the very purpose of preventing a bank from investing too large a part of its assets in an elaborate bank building. An individual could invest all of his money in a home if he so desired, but a bank is handling other people's money and not its own, and to protect this money and assets, the statute referred to was enacted.

The payment of the rent as provided for in the "trust agreement" for so expensive a bank home is taking money from the earnings of a solvent bank, and from the creditors of the bank on its failure. In the instant case, the $125,000 paid by purchasers to the trustee for land trust certificates would have to yield 5½% to pay the $6875 annual rent on the bank building, not including taxes, insurance, repairs, etc. It can not well be argued, therefore, that the bank and the depositors were benefitted by the substitution of liquid assets, cash, for unliquid assets, real estate, and it is certainly not claimed that this was the motive in establishing the trust; it was a "window-dressing" operation to bring the bank's financial statement within the provisions of a positive statute; and even though it were done with the approval of the Superintendent of Banks, yet if it is and was unlawful, no estoppel is thereby created against interested and affected parties or a subsequent Superintendent of Banks.

The "land trust certificates" herein were issued against the "trust estate" consisting of the land and one-third of the building, in all of which the bank reserved a ninety-nine year lease, renewable forever. It follows that the purchasers of the land trust certificates did not receive such an interest in the land as could have been alienated and conveyed to another. The holders of these certificates in no event, by the terms of the "trust agreement," could ever get any of the land, only the proceeds—money. The certificates issued provided:

"The trustee agrees that it will pay (quarterly) to the registered holder of this certificate at the close of business on the preceding day of (the month of each quarter) said holder's proportionate share of the net proceeds of all income from the proper-

ties described * * * the trust estate accrued and paid up to the close of the calendar quarter * * * and that upon any sale of said properties and the termination of the trust, it will pay to the registered holder hereof such holder's proportionate share of the net proceeds derived from such sale, all as provided in Part Two of said Declaration."

The real estate and building in the instant case were an asset of the bank; the securities in the Ulmer case were an asset of the bank; both were "property" of the respective banks and the rule announced in the Ulmer case holds that a bank having a trust department is "totally lacking in power or authority to create trusts out of its own property," that a bank may not act in the dual capacity of settlor and trustee by creating trusts out of its own property, and that a banking institution with a single board of directors is one corporate entity, no matter how many departments it may form, either as a matter of convenience in transacting its business, or to meet requirements prescribed by law.

As we understand the decision in the Ulmer case, we see no difference in principle, though there may be a difference in some of the facts, between the case before us and that case. We do not believe that the facts here remove this case from the inhibitions of the Ulmer case and give what was here done the stamp of approval as a sound public policy. Public policy can never approve an illegal act, and if it cannot be approved by public policy, it is "against public policy" in the eyes of the law.

Decree for the appellee in each case will be entered.

Decrees accordingly.

LLOYD and CARPENTER, JJ, concur.