Zimmerman, J.
 

 Did the bank possess power and authority to create trusts of the kind here involved?
 

 It is a prevailing rule, in Ohio and elsewhere, that banks and trust companies, though organized primarily for private profit, are of a preeminently public nature and have only such powers as are
 
 expressly
 
 conferred on them by their charters and by statute, of such as may fairly be implied from those expressly given. 5 Ohio Jurisprudence, 363, Section 73; 3 Ruling Case Law, 419, Section 46; 7 Corpus Juris, 585, Section 213; 4 Michie on Banks and Banking, 8, Section 5; 2 Morse on Banks
 
 &
 
 Banking (6 Ed.), 1557, Section 777; 1 Morse on Banks & Banking, 14, Section 6.
 

 Do the statutes of Ohio authorize a combined bank and trust company to create a trust out of its own assets and sell participation certificates therein to others ?
 

 A number of Ohio statutes define the powers and functions of trust companies. Those asserted to be applicable, as cited and commented upon by counsel, are as follows:
 

 “Sec. 710-156. A trust company may
 
 receive cmd hold
 
 moneys, or property in trust, or in deposit from executors, administrators, assignees, guardians, trustees, corporations or individuals upon such terms and conditions as may be agreed upon between the parties.”
 

 “Sec. 710-159. A trust company may act as agent, and
 
 take, accept and execute
 
 any and all trusts, duties
 
 *333
 
 and powers in regard to the holding, management and disposition of any property or estate, real or personal, which may be committed or transferred to, or vested in said trust estate, and the rents and profits thereof or the sale thereof, as may be granted or confided to it by any person, association, corporation, municipal or other authority; and may act as trustee under any will or deed or other instrument creating a trust for the care and management of property under the same circumstances and in the same manner, and subject to the same control by the court having jurisdiction of the same as in the case of a legally qualified person.”
 

 “Sec. 710-164. In the management of money and property
 
 held
 
 by it as trustee, such trust company may invest such money and property in a general trust fund of the trust company. But it shall be competent for the authority making the appointment to direct whether such money and property shall be held separately or any part thereof invested in a general trust fund of the trust company. The trust company always shall follow and be entirely governed by the directions contained in any will or instrument under which it acts.”
 

 “Sec. 710-165. No property or securities
 
 received or heldloj
 
 any trust company in trust shall be mingled with the investments of the capital stock or other properties belonging to such trust company or be liable for its debts or obligations. Moneys pending distribution or investment may be treated as a deposit in the trust department or may be deposited in any other department of the bank, subject in other respects to the provisions of law relating to deposit of trust funds by trustees and others.” (108 Ohio Laws, part 1, 122.) (Italics ours throughout.)
 

 Under the laws of Ohio, a banking institution such as The Commercial Savings Bank
 
 &
 
 Trust Company, with a single board of directors, is one corporate
 
 *334
 
 entity, no matter how many departments it may form, either as a matter of convenience in transacting its business, or to meet requirements prescribed by law.
 

 Statutes relating to the same subject-matter must be read and construed together. A perusal of the Ohio Banking Act, particularly the part relating to trust companies, is unconvincing in support of the proposition that a bank with trust powers may create a trust out of its own securities and sell participating shares therein. Such procedure is foreign to the accepted notions of the proper business and functions of a trust company, viz.,
 
 the acceptance and execution of trusts at the instance of others,
 
 and we are unwilling through conjectural and dubious construction to'extend to banks exercising trust prerogatives such broad and far-reaching powers as the formation of trusts out of their own property would give them, when the General Assembly has not seen fit to do so through plain and unequivocal language.
 

 Besides, such course of conduct is so antagonistic to the fundamental conceptions of the manner in which a bank and trust company should operate and offers so many openings for abusive practices as to be opposed to sound public policy. Think of the ensuing possibilities. A bank by setting up trusts in its own securities (which securities are changeable at will), and selling participation certificates therein, may cause an immediate conflict between its general depositors and the holders of the participation certificates. The opportunity is afforded to place the first class securities in the trusts and allow the poorer securities to remain among the general assets, to the prejudice of the general depositors, or
 
 vice versa. ^A
 
 bank owes the duty of impartiality and fair dealing toward all with whom it does business.
 

 The profit feature is another indefensible element. That á trustee may directly profit from the management of a trust estate, at least in the absence of an
 
 *335
 
 express agreement to that effect, is against every established, notion connected with the administration of trusts. In these modern times a trustee is, of course, entitled to reasonable compensation for his services, but such compensation may not take the form of direct profits from the manipulation of the trust estate.
 

 The records in the cases before us are clear that the bank was engaged in a profit-making venture. For instance, the rate of interest on the various mortgages apportioned to the several alleged trusts was not less than six per cent, whereas the rate of interest to be paid on the participation certificates was not more than five or five and one-half per cent, the bank pocketing the difference. Again, the bank bought an entire issue of The Jamestown Land Company bonds, amounting to $60,000, at a price of ninety-three cents on the dollar, and shortly thereafter turned them into purported trust No. 636 at par, taking credit of one hundred cents on the dollar therefor. What would there be to prevent the bank in the hands of an unscrupulous management from buying low grade first mortgages at substantial discounts, selling them to itself as trustee at face value for placement in the participation trusts, and making a clear profit of the difference? No interference by way of restrictions or supervision stands in the way.
 

 Transactions partaking of somewhat analogous characteristics have been condemned, disapproved and nullified by this court on a number of different occasions.
 
 Cox, Admr.,
 
 v.
 
 John,
 
 32 Ohio St., 532;
 
 Caldwell
 
 v.
 
 Caldwell,
 
 45 Ohio St., 512, 523, 15 N. E., 297;
 
 Riddle and Parker
 
 v.
 
 Roll,
 
 24 Ohio St., 572;
 
 Piatt
 
 v.
 
 Longworth’s Devisees,
 
 27 Ohio St., 159, 195. And see,
 
 St. Paul Trust Co.
 
 v.
 
 Strong,
 
 85 Minn., 1, 88 N. W., 256.
 

 It is a salutary rule of long recognition that a trustee cannot sell his individual property to himself as trustee. 65 Corpus Juris, 653, Section 520;
 
 Old Dominion Copper Mining & Smelting Co.
 
 v.
 
 Bigelow,
 
 
 *336
 
 203 Mass., 159, 89 N. E., 193, 40 L. R. A. (N. S.), 314 (affirmed, 225 U. S., 111, 32 S. Ct., 641, 56 L. Ed., 1009, Ann. Cas. 1913E, 875);
 
 In re Howard’s Guardianship, Howard
 
 v.
 
 Bank of America Natl. Trust & Savings
 
 Assn.,-Cal.,-, 24 P. (2d), 482, 483-484.
 

 Thus, it was held in
 
 In re Long Island Loan & Trust Co.,
 
 92 App. Div., 1, 87 N. Y. S., 65: “The sale by a trustee of its own property to the trust is void as against public policy.”
 

 In
 
 Cornet
 
 v.
 
 Cornet,
 
 269 Mo., 298, 323, 190 S. W., 333, the court remarks: “The rule is imperative that a trustee cannot buy his own property for the purpose of the trust. It makes no difference that the sale is intrinsically a fair one and for a full consideration. 11 The policy of equity is to remove every possible temptation from the trustee.’ ”
 

 Statutory recognition of the policy, prohibiting trustees from buying or selling to themselves, is to be found in the recently enacted Section 10506-49, General Code, which applies to fiduciaries appointed by and accountable to the Probate Court. That section reads:
 

 “Fiduciaries shall not buy from or sell to themselves nor shall they in their individual capacities have any dealings with the estate, any power in the instrument creating the trust to tlxe contrary notwithstanding.”
 

 For a particular undertaking to be against public policy, actual injury need not be shown. It is enough if the potentialities for harm are present.
 
 Porter
 
 v.
 
 Trustees of Cincinnati Southern Ry.,
 
 96 Ohio St., 29, 33, 117 N. E., 20, quoting 9 Cyc., 481.
 

 But let us assume, for the purposes of the discussion,’that the bank did possess power and authority to create trusts in its own property, and that such procedure was not against public policy, did it actually establish such trusts?
 

 We turn first to the declarations of trust and the
 
 *337
 
 participation certificates and read such expressions as these:
 

 “The first mortgage notes and first mortgage real estate bonds so deposited as aforesaid are to remain under the absolute control, management and possession of said bank and may be withdrawn from the Trust Department from time to time by substituting for such mortgage notes or mortgage bonds so withdrawn, cash or other first mortgage notes or first mortgage bonds of like face value, and under the same limitations as to the rate of interest, * * V’
 

 “The interest shall be payable semi-annually to the holders of said Certificates of Participation pro rata, both principal and interest to be paid only from the moneys collected on account of the principal and interest on the mortgage notes and mortgage bonds so held on deposit by the said Trust Department as the same may be collected, and not otherwise, # * *.”
 

 “1. The undersigned [bank] shall at all times have and retain title to and possession, management, and control of said moneys, notes, and bonds * *
 

 “2. As and when the undersigned [bank] receives payment of interest upon said securities, and not otherwise, it will pay to the record holder hereof such proportion of said interest so received accruing on said securities from and after the date hereof as the amount of this certificate bears to the entire amount of said securities, but in no event shall the interest so paid be more than____per cent per annum on the face value of this certificate, payable semi-annually.”
 

 “3. The term of this certificate shall expire * * * [on a date certain], at which time, or as soon thereafter as sufficient funds have been collected in due course of business on account of the notes and bonds held hereunder, the undersigned will pay to the registered holder hereof, his pro rata share of the funds so collected, but in no event more than the face value of this certificate.”
 

 
 *338
 
 Next we examine the conduct of the bank in connection with the management and execution of the alleged trusts, and find a number of matters of more or less significance. At the times these purported trusts came into being through the declarations of trust, securities in the amounts for which the “trusts” were formed ($1,000,000 for trust No. 636, and $250,000 for each of the others) were not then allotted to the trusts, but such securities were furnished to equal the amount of the participation certificates as the same were sold. The participation certificates were generally-sold to purchasers by the commercial or bond department of the bank, and ran for a period of two years from the date of purchase. All the certificates in trust No. 681 were disposed of through the banking or commercial part of the bank, and none through the trust department. None of tire notes allocated on the books of the bank to the various “trusts” was endorsed by the barik to itself as trustee. Instead, the trust number was marked on the note in pencil and the note was left in the files of the trust department, a duplicate being placed in the files of the mortgage loan department. None of the mortgages was assigned to the bank as trustee, at all times remaining payable to The Commercial Savings Bank & Trust Company. They, together with insurance policies, containing mortgage clauses in favor of the bank, abstracts and other papers pertaining to each mortgage loan, were segregated in separate files, marked with the number of the particular “trust” to which allotted, and were retained in the mortgage loan department of the bank. Either the mortgage loan department or the discount department made collections of interest and principal on the various notes and mortgages, placing the money received with other collections and later furnishing the trust department with a record of such payments. Notices to mortgagors that payments were due on their obligations were sent out by the mortgage loan
 
 *339
 
 department, and
 
 no mortgagor was directly notified that the note and mortgage on which he was indebted had become a part of any purported trust.
 
 The bank paid the salaries of all its officers and employees, no matter with what department connected. On occasion, the bank paid the interest on participation certificates before collections had been made on the notes and mortgages allocated to particular “trusts”. The bank freely exercised its right to substitute one note and mortgage for another, and was at all times in complete control, retaining the legal title to all securities.
 

 Of course, if any trusts were established they were express trusts, because formed through written instruments of definite terms.
 

 As we understand the theory of counsel supporting the validity of the “trusts”, The Commercial Savings Bank & Trust Company occupied the dual position of settlor and trustee, with the participation certificate holders in the role of
 
 cestuis que trustent
 
 or beneficiaries. Briefly, a trust is the right, enforceable in equity, to the beneficial enjoyment of property, the legal title to which is in another. The one who creates the trust is said to settle it on another, and bears such designations as “donor”, “settlor”, or “trustor”. He to whom the property is given in trust and in whom the legal title vests, is named the trustee. The one for whose benefit the trust is created is called the
 
 cestui que
 
 trust, or beneficiary. And the property given in trust is called the subject-matter, or trust
 
 res.
 

 A concise definition of an express trust is found in 65 Corpus Juris, 231, Section 21, as follows:
 

 “While its elements have been variously stated to constitute an express trust there must be an explicit declaration of trust, or circumstances which show beyond reasonable doubt that a trust was intended to be created, accompanied with an intention to create a trust, followed by an actual conveyance or transfer of
 
 *340
 
 lawful, definite property or estate or interest, made by a person capable of making a transfer thereof, for a definite term, vesting the legal title presently in a person capable of holding it, to hold as trustee for the benefit of a cestui que trust or purpose to which the trust fund is to be applied; or a retention of title by the owner under circumstances which clearly and unequivocably disclose an intent to hold for the use of another.”
 

 While it is undoubtedly true that the settlor and |trustee may be one and the same person, his words ,'and acts must clearly and unmistakably denote an in-i'tention to hold certain property thenceforth as trus,tee for the benefit of another; the essentials of a trust ¡must exist.
 
 Worthington
 
 v.
 
 Redhey,
 
 86 Ohio St., 128, 135, 99 N. E., 211; 65 Corpus Juris, 277, Section 61 et seq.; 26 Ruling Case Law, 1182, Section 19; 1 Perry on Trusts and Trustees (7 Ed.), 27, Section 38;
 
 In re Small’s Will,
 
 27 App. Div., 438, 443, 50 N. Y. S., 341, 344 (appeal dismissed, 158 N. Y., 128, 52 N. E., 723).
 

 A close scrutiny of the declarations of trust herein and of the certificates of participation, coupled with a consideration of the manner in which the bank treated the subject-matter of the purported trusts, shows that the participation certificate holders as the supposed beneficiaries never had any rights in the securities themselves. At the most, their rights were only to the proceeds collected from the securities.
 

 But this latter discussion is really beside the point, in view of the conclusion we have reached, that the bank was totally lacking in power or authority to create trusts out of its own property.
 

 Counsel supporting the validity of the alleged trusts advance the argument that even if the trusts are invalid, the acts of the bank in creating them were at the most but
 
 ultra vires
 
 and Section 8623-8, General Code, a part of the General Corporation Act, and Section 710-52, General Code, apply, and plaintiff in error,
 
 *341
 
 a participation certificate holder who has received and accepted interest, is estopped to challenge them.
 

 In the first place we think Section 8623-8 has no bearing on the state of facts here found, for, as is said in 3 Ruling Case Law, 420, Section 47:
 

 “A banking corporation occupies a different relation to the public from that of ordinary business corporations in that it invites individuals to submit to it the possession and care of their money and property. Where a corporation is organized for business or trading purposes, and the only persons interested therein, other than its business creditors, are its stockholders, and their only interest therein is to secure dividends upon their investment, the question of ultra vires is of comparatively small importance, except in behalf of the people of the state in their public capacity, and the courts treat the question as it relates to such a corporation differently from the case of a banking corporation. And an act that is void because beyond the power of a national bank cannot be made good by estoppel. If, however, a banking corporation receives the property of a person under an express contract, though ultra vires, to return the same, it cannot avoid the duty to do so, on the ground that the contract was ultra vires. It may have had no legal power to take the steps by which the money or property of third persons came into its hands, but, having taken such steps and obtained their money or property, no such absurdity exists as a legal obstacle to its surrendering it. It would be a reproach to the law to hold any such doctrine of inequity. And this rule is fully applicable to national banks.”
 

 In the next place the acts of the bank in setting up these various purported trusts, affecting the interests of different classes of its customers, being not only beyond its granted powers but against public policy “cannot be made good by estoppel”. There is a distinction between acts of a corporation which are in
 
 *342
 
 valid for all purposes and in relation to all persons, and those within the range of its general powers which are accomplished in an unauthorized manner. This distinction is commented upon in the case of
 
 Ehrman
 
 v.
 
 Union Central Life Ins. Co.,
 
 35 Ohio St., 324, 337. And see, 2 Morse on Banks and Banking (6 Ed.), 1492, 1505, Sections 735 and 746.
 

 The Supreme Court of the United States has recently spoken on the subject in the case of
 
 Texas S Pacific Ry. Co.
 
 v.
 
 Pottorff, Recr.,
 
 291 U. S., 245, 78 L. Ed., 777, 54 S. Ct., 416, in which the effect of its holding is that national banks have no powers except those conferred by Congress. Hence, even where such a bank fully performs a contract unauthorized by law, it is a nullity and estoppel cannot be interposed to circumvent its invalidity. The principle of this case, at least, is applicable to the present situation.
 

 Of course the holders of the participation certificates are not without relief. Actual knowledge of the invalidity of the “trusts” is not fairly chargeable to them. To hold under the circumstances that their money is irretrievably gone would be inequitable and unconscionable. If The Commercial Savings Bank
 
 &
 
 Trust Company were a going, solvent institution, the participation certificate holders would be entitled to demand and receive the full amount paid for their certificates, the bank having been enriched by the receipt of their money; but the bank is insolvent, the purported trusts are invalid, and the rights of other persons are to be considered and protected. We do not see how the certificate holders can be placed in any better position than general creditors of the bank.
 
 Taylor, Bank Commr.,
 
 v.
 
 Arkansas Democrat Co.,
 
 186 Ark., 343, 54 S. W. (2nd), 59.
 

 And now we come to the rights of the mortgagors (whose notes and mortgages were allotted to the different purported trusts and who were also general depositors in the bank), to set off their deposits against
 
 *343
 
 their mortgage indebtedness. Since no valid trusts were formed out of their notes and mortgages and the legal title to the same remained at all times in the bank, such right of set-off cannot be denied. When these mortgagor-depositors deposited their money in the bank, the relationship of creditor and debtor between them and the bank was established. When they borrowed money from the bank, the relationship of debtor and creditor came into existence. The accounts being mutual, set-off must be recognized. Whether or not the notes and mortgages were due is immaterial. The insolvency of the bank invokes the rule of equitable set-off recognized in this state.
 

 Without further lengthening this opinion, attention is directed to the following citations on the above propositions:
 
 Second Natl. Bank of Cincinnati
 
 v.
 
 Hemingray,
 
 34 Ohio St., 381;
 
 Armstrong, Recr.,
 
 v.
 
 Warner,
 
 49 Ohio St., 376, 31 N. E., 877, 17 L. R. A., 466; 5 Ohio Jurisprudence, 456, Section 138; 36 Ohio Jurisprudence, 515, Section 11; 25 A. L. R., 938 et seq., 82 A. L. R., 665 et seq.;
 
 Reichert
 
 v.
 
 Fidelity Bank & Trust Co.,
 
 257 Mich., 535, 242 N. W., 236.
 

 While the statement is doubtless unnecessary, it naturally follows that the participation certificate holders have no special rights in the securities deposited by the bank with the Treasurer of the State of Ohio under Section 710-150, General Code. Neither was the bank a guarantor of the participation certificates, the certificates themselves being quite plain on this point.
 

 The judgments of the Court of Appeals are reversed and the cases remanded to that court for further proceedings not inconsistent with this opinion.
 

 Judgments reversed.
 

 Weygandt, C. J., Stephenson, Matthias and Day, JJ., concur.
 

 Williams and Jones, JJ., not participating.