ESTATE OF POWEL CROSLEY, JR., DECEASED, MARTHA PAGE CROSLEY KESS, EXECUTRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1341–64.    Filed December 16, 1966.

*James W. Farrell, Jr., Bruce S. Lane,* and *Richard W. Barrett,* for the petitioner.

*John J. Larkin,* for the respondent.

HOYT, *Judge:* Respondent determined a deficiency of $1,021,062.30 in the estate tax of the Estate of Powel Crosley, Jr., deceased.  The parties having settled by stipulation an issue involving the valuation of certain real property, the only question for our decision is whether the proceeds of 25 insurance policies covering the life of Powel Crosley, Jr., are includable in his estate under the provisions of section 2042, 2036, or 2038 of the Internal Revenue Code of 1954.[1]

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

FINDINGS OF FACT

Powel Crosley, Jr. (hereinafter referred to as Crosley or as decedent), died on March 28, 1961, and his will was admitted to probate in Hamilton County, Ohio, on March 31, 1961. Martha Page Crosley Kess is the duly appointed and qualified executrix of the Estate of Powel Crosley, Jr., and in that capacity she filed a Federal estate tax return with the district director of internal revenue at Cincinnati, Ohio, on June 18, 1962.

At the time of his death Crosley was insured pursuant to at least 25 life insurance policies as follows:

| Policy No. | Date of issuance | Face amount | Insurer |
|---|---|---|---|
| 1033292 | 3/17/34 | $50,000 | Aetna Life Ins. Co. |
| 462222* | 12/26/34 | 100,000 | Connecticut General Life Ins. Co. |
| 848893* | 12/24/34 | 100,000 | Connecticut Mutual Life Ins. Co. |
| 9671904* | 12/28/34 | 200,000 | Equitable Life Assurance Society. |
| 9086562 | 3/17/33 | 50,000 | Do. |
| 422440 | 3/19/18 | 3,000 | Massachusetts Mutual Life Ins. Co. |
| 408446 | 7/ 2/17 | 2,000 | Do. |
| 1240916 | 3/11/26 | 155,000 | Mutual Benefit Life Ins. Co. |
| 4918673* | 12/29/34 | 100,000 | Mutual Life Ins. Co. of New York. |
| 632317* | 12/24/34 | 100,000 | National Life Ins. Co. |
| 552826 | 3/17/26 | 155,000 | New England Mutual Life Ins. Co. |
| 390236 | 1/26/20 | 15,000 | Do. |
| 362609 | 2/13/19 | 8,000 | Do. |
| 27802 | 12/30/34 | 50,000 | Columbia Life Ins. Co. |
| 27803 | 12/30/34 | 50,000 | Do. |
| 1730167 | 3/14/33 | 100,000 | Penn Mutual Life Ins. Co. |
| 688171* | 12/26/34 | 25,000 | Phoenix Mutual Life Ins. Co. |
| 703964 | 3/15/33 | 100,000 | Provident Mutual Life Ins. Co. |
| 8732024* | 12/27/34 | 100,000 | Prudential Ins. Co. of America. |
| 336793B | 3/17/33 | 50,000 | State Mutual Life Ins. Co. |
| 197134 | 3/13/19 | 5,000 | Do. |
| 119035EX | 3/24/19 | 2,000 | Do. |
| 185885EX | 3/24/19 | 2,500 | Do. |
| 185886EX | 3/24/19 | 2,500 | Do. |
| 1224776* | 12/29/34 | 100,000 | Union Central Life Ins. Co. |

*Each of the eight policies marked with an asterisk was a single-premium life policy issued in conjunction with an annuity policy under such circumstances that the issuing company assumed no insurance risk in connection with the issuance of the life policy. The fact that some of the policies bear an issuance date subsequent to the date of the trust agreement hereinafter mentioned is not explained by the record.

During the year 1934 and thereafter Crosley was assisted in matters related to his life insurance policies by a corporation known as the Estate Planning Corp., and more particularly, by Clinton Davidson, president of that corporation. Davidson was also listed as the soliciting agent in the application for many of the above-listed policies on Crosley's life.

At sometime prior to December 20, 1934, Davidson and Crosley began discussing the idea of Crosley's establishing an irrevocable inter vivos trust to which he would transfer all of his right, title, and interest in certain life insurance policies. It was considered important to make the proposed transfers, if they were to be made, prior to the end of 1934, "because the gift tax [would] be 50% more if done after December 31."

Charles Sawyer had been Crosley's attorney and close personal associate since 1924, and Crosley consulted him about most of his affairs. When Crosley sought Sawyer's advice in 1934 regarding the life insurance trust which Crosley had been discussing with Davidson, Sawyer advised him not to go into it and to invest his money in stock. Despite this advice, Crosley went ahead with the transaction and Sawyer consented to become one of the trustees.

On December 27, 1934, Crosley and certain other persons, identified hereinafter, executed the following instrument:

I, Powel Crosley, Jr., hereby assign and transfer unto Charles Sawyer, Lewis M. Crosley, Powel Crosley III, trustees, the survivor or survivors thereof, policies of insurance on my life as set forth in Schedule A attached hereto and made part hereof, to have and to hold the same in trust for the following uses and purposes, to wit: To enter into such an agreement with the company issuing each of said several policies with reference to the distribution of the proceeds of said policy and all matters with respect to the rights of any person under said policy as my said trustees in their discretion may deem advisable.

Said agreements, however, shall provide that none of said policies or the proceeds thereof shall in any manner inure to said Powel Crosley, Jr., and said trustees shall in said contracts designate as beneficiaries one or more members of the family of the said Powel Crosley, Jr., including Gwendolyn A. Crosley, Powel Crosley III, and Page Crosley, and the issue or descendants of any of them including Lewis L'Hommedieu Crosley, the child of Page Crosley.

As said trustees shall have entered into such an agreement with each of said respective companies their powers as trustees shall thereupon cease and terminate, and any contracts or designations made by the trustees pursuant hereto shall be irrevocable.

In no event shall I, Powel Crosley, Jr., pay or be obligated to pay any premiums on policies of insurance on my life held by the trustees hereunder and it shall not be the duty of the trustees to pay any premiums on such policies.

The trust hereby created shall be governed by the laws of Ohio.

I, Powel Crosley, Jr., hereby declare that from and after the execution of these presents, I shall have no right, title, or interest in and unto the policies of life insurance set forth in Schedule A hereof and further that I, Powel Crosley, Jr., shall have no right to alter, amend or revoke any of the provisions hereof or any of the trust herein created nor to revest in myself title to any part of the corpus of any trust fund as from time to time constituted.

In witness whereof, I have signed these presents at Cincinnati, Ohio, this 27th day of December, 1934.

(S)  POWEL CROSLEY, JR.

In the presence of:
 (S)  CLINTON DAVIDSON
 (S)  JOHN S. WALTERS

The undersigned trustees do hereby accept the foregoing and agree to the terms thereof.

      (S)  CHARLES SAWYER
      (S)  LEWIS M. CROSLEY
      (S)  POWEL CROSLEY III

 (S)  DOROTHEA E. LYNCH
 (S)  W. HENRY WALKER

SCHEDULE A

| Policy No. | Company | Amount |
|---|---|---|

[There are here listed the 25 policies described above.]

Powel Crosley III and Lewis M. Crosley were decedent's son and brother, respectively. Gwendolyn A. Crosley and Page Crosley were Crosley's wife and daughter, respectively. Charles Sawyer was decedent's lawyer and personal advisor, as stated above.

Upon execution of the December 27, 1934, instrument, Crosley executed a separate assignment of each of the subject insurance policies to the three trustees. Each assignment was filed with the insurance company issuing the policy to which the assignment pertained, together with a copy of the trust instrument. These assignments were on various forms provided by the respective issuing companies and accordingly varied in terms. However, each was, in general, an absolute assignment transferring to the three trustees named in the agreement of December 27, 1934, all of the right, title, and interest of Powel Crosley, Jr., in and to the policy in question, including the right to borrow thereon, to surrender the policy for its cash value and to name the beneficiary. No rights were reserved to Crosley as owner of the policies or as insured thereunder in these assignments.

In 1935 Crosley filed a Federal gift tax return for 1934, listing the subject insurance policies at a value in excess of $500,000 and reporting their transfer in trust for the benefit of members of the donor's family; the tax due as indicated by the return was duly paid.

During 1935 and early 1936 the trustees, acting pursuant to the instructions in the December 27, 1934, document to use their discretion in choosing the manner of settlement in favor of the designated group of beneficiaries, entered into settlement agreements with the insurance companies which had issued the subject insurance policies. An agreement was entered with respect to each policy, designating (i) the beneficiaries of the policy and (ii) the time and the manner in which the beneficiaries were to receive their respective interests. Some of the agreements also dealt with the extent to which and by whom the incidents of ownership of the policy could be exercised. Again, as in the case of the assignments, the form of the settlement agreements was not uniform from company to company. With respect to some policies the settlement agreement was a single instrument attached to the policy as an endorsement and signed by the trustees and the issuing company. With respect to other policies, the settlement agreement consisted of one or more applications signed by the trustees to change beneficiaries and vest the ownership of the policy, and one or more endorsements to the policy designating the beneficiaries and owners of the policy in accordance with the trustees' applications. In the case of four of the policies (two Equitable Life,

Mutual Life, and Penn Mutual) the right, title, and interest of the trustees in the policies were assigned by the trustees outright to members of Crosley's family.

Negotiations with all of the insurance companies leading up to the above-described settlement agreements were carried out on behalf of the trustees by Davidson through his Estate Planning Corp. and by lawyers for the trustees. In many instances these negotiations were extensive, involving numerous exchanges of letters and lasting several months. Many of the insurance companies raised questions about the manner of settlement proposed by the trustees, and some refused to adopt the trustees' proposals without certain changes. Some of the objections raised were based upon company policy and some upon what company officers and attorneys considered questionable legality of certain aspects of the settlement proposal both under local law and under the terms of the December 27, 1934, instrument. However, with but one exception, these questions were related only to the *terms of settlement* proposed by the trustees. They were *not* related to the *validity of the trust* or the December 27, 1934, transfer of ownership of the policies to the trustees.

Only one insurance company, Massachusetts Mutual, refused to accept the validity of the December 27, 1934, trust and the power of the trustees thereunder to act without the approval of Crosley. None of the other 15 companies denied the trustees' ownership and power to act within the scope of the December 27, 1934, document. Davidson and the trustees acceded to most of the changes requested by the insurance companies, and, as previously stated, settlement agreements were reached with respect to all of the policies.[2]

In form transmittal letters written in December 1935, to at least four of the insurance companies, Davidson indicated that he would forward the subject policy to the company for endorsement of the settlement agreement thereon "as soon as received from the insured."

Some of the subject policies, after endorsement incorporating the trustees' settlement agreement, provided that the usual rights of ownership (e.g., right to change beneficiary, obtain cash surrender value, etc.) were canceled. Such cancellation was pursuant to the settlement agreement as requested by the trustees pursuant to the terms of the December 27, 1934, instrument under which the powers of the trustees were to cease and terminate after they entered into each respective settlement agreement. The settlement agreement endorsement to other policies, however, contained no such cancellation of rights. In their negotiations with Davidson many of the issuers of these latter policies indicated that it would not be possible for the

---

[2] Massachusetts Mutual agreed to the settlement proposed by the trustees upon receipt of written approval from Crosley.

trustees to relinquish these rights absolutely, leaving them vested in no one.[3]

Most of the policies as endorsed by the respective settlement agreements contain spendthrift provisions to prevent the beneficiaries and their creditors from reaching the proceeds.

Gwendolyn A. Crosley died on February 26, 1939, and Powel Crosley III died on June 14, 1948. Decedent was appointed and served as executor of both of their estates. None of the insurance policies here involved were included in either of their gross estates as reported by decedent as fiduciary in their Federal estate tax returns.

Upon Crosley's death in 1961, the proceeds of each policy were held or paid by the insurers in accordance with the settlement agreements entered into with respect to each policy by the respective companies and the trustees. None of the proceeds of any policy were paid to or held for the benefit of Crosley's estate.

In his deficiency determination issued January 8, 1964, the respondent increased petitioner's Federal estate tax liability by $1,021,062.30, which deficiency resulted from the additions to the value of the taxable estate of real estate valued at $180,720 and insurance valued at $1,661,524.85. The issue involving the real estate has been settled by stipulation of the parties. In the explanation of adjustments with reference to the insurance, the deficiency notice stated that in accordance with sections 2033, 2036, and 2042 of the Internal Revenue Code of 1954, insurance on the life of the decedent is includable in the gross estate in the amount of the adjustment mentioned above. During the trial and by amendment to pleadings the respondent raised the new and additional issue that the insurance policies in question were includable in the gross estate of the decedent under section 2038 of the Internal Revenue Code of 1954. Respondent concedes that the burden of proof with respect to this new issue is on him. Respondent has abandoned any contention that section 2033 applies.

#### ULTIMATE FINDINGS OF FACT

The decedent, Powel Crosley, Jr., transferred and set over to the trustees named in the agreement of December 27, 1934, all of his interests and incidents of ownership in the life insurance policies listed in the schedule of trust assets. He neither retained any interest whatever in those policies nor did he thereafter reacquire any incidents of ownership; at the time of his death, Crosley had no incidents of ownership or right, title, or other interest in any of the said policies.

---

[3] Though at least one company indicated that while the insurance policy itself as endorsed could not provide for cancellation of these rights absolutely, the company would have to look to the trustees' powers under the 1934 trust instrument in dealing with the trustees and would be bound to respect the limitation of powers contained therein. However, the insurance company files contain no indication that it was questioned that the trustees had and possessed all the incidents of ownership with which they sought to deal.

The original deficiency in this case is in excess of $1 million. Respondent is after big game, but his weapons, sections 2042, 2036, and 2038, are blunt against the impervious hide of the decedent's estate planning. Arguments that there was an elaborate and deliberately confused tax-avoidance scheme concocted by masterminds, are just not supported by the evidence before us. Respondent's quarry is not to be bagged by mere characterizations and repetitive but unsupported charges of "sham" and "tax avoidance scheme."

Respondent contends that the face amount of each of the subject insurance policies is includable in decedent's gross estate, relying primarily upon section 2042(2), which deals directly with life insurance proceeds.[4] He admits on brief, however, that the eight policies which were issued in conjunction with annuity policies and involved no insurance risks are not covered by section 2042.[5] As to these policies, and by way of alternative contention as to all of the other policies, respondent contends that sections 2036 and 2038 require inclusion in the gross estate.

Section 2042 applies to include life insurance in the gross estate when the decedent, at the time of his death, possesses incidents of ownership of the life insurance policies. The Estate Tax Regulations, sec. 20.2042–1(c), provide certain ground rules:

(c) Receivable by other beneficiaries. (1) Section 2042 requires the inclusion in the gross estate of the proceeds of insurance on the decedent's life not receivable by or for the benefit of the estate if the decedent possessed at the date of his death any of the incidents of ownership in the policy, exercisable either alone or in conjunction with any other person. However, if the decedent did not possess any of such incidents of ownership at the time of his death nor transfer them in contemplation of death, no part of the proceeds would be includible in his gross estate under section 2042. Thus, if the decedent owned a

---

[4] SEC. 2042. PROCEEDS OF LIFE INSURANCE.
The value of the gross estate shall include the value of all property—

\*     \*     \*     \*     \*     \*     \*

(2) RECEIVABLE BY OTHER BENEFICIARIES.—To the extent of the amount receivable by all other beneficiaries as insurance under policies on the life of the decedent with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person. For purposes of the preceding sentence, the term "incident of ownership" includes a reversionary interest (whether arising by the express terms of the policy or other instrument or by operation of law) only if the value of such reversionary interest exceeded 5 percent of the value of the policy immediately before the death of the decedent. As used in this paragraph, the term "reversionary interest" includes a possibility that the policy, or the proceeds of the policy, may return to the decedent or his estate, or may be subject to a power of disposition by him. The value of a reversionary interest at any time shall be determined (without regard to the fact of the decedent's death) by usual methods of valuation, including the use of tables of mortality and actuarial principles, pursuant to regulations prescribed by the Secretary or his delegate. In determining the value of a possibility that the policy or proceeds thereof may be subject to a power of disposition by the decedent, such possibility shall be valued as if it were a possibility that such policy or proceeds may return to the decedent or his estate.
[5] See *Helvering* v. *LeGierse,* 312 U.S. 531 (1941).

policy of insurance on his life and, 4 years before his death, irrevocably assigned his entire interest in the policy to his wife retaining no reversionary interest therein * * * the proceeds of the policy would not be includible in his gross estate under section 2042.

(2) For purposes of this paragraph, the term "incidents of ownership" is not limited in its meaning to ownership of the policy in the technical legal sense. Generally speaking, the term has reference to the right of the insured or his estate to the economic benefits of the policy. Thus, it includes the power to change the beneficiary, to surrender or cancel the policy, to assign the policy, to revoke an assignment, to pledge the policy for a loan, or to obtain from the insurer a loan against the surrender value of the policy, etc. Similarly, the term includes a power to change the beneficiary reserved to a corporation of which the decedent is sole stockholder.

Respondent makes no contention that decedent retained any "reversionary interest" in any of the policies, as that term is used in section 2042 and related regulations, nor does he contend that any of the policies here involved were transferred in contemplation of death. His principal contention is that the purported life insurance trust was a sham and that Crosley actually retained the incidents of ownership and possessed them at his death.

We cannot agree. The language of the December 27, 1934, trust instrument makes it abundantly clear that Crosley intended to divest himself of all incidents of ownership:

I, Powel Crosley, Jr., hereby assign and transfer * * * policies of insurance on my life as set forth in Schedule A * * *

\* \* \* \* \* \* \*

I, Powel Crosley, Jr., hereby declare that from and after the execution of these presents, I shall have no right, title, or interest in and unto the policies of life insurance set forth in Schedule A hereof and further that I, Powel Crosley, Jr., shall have no right to alter, amend or revoke any of the provisions hereof or any of the trust herein created nor to revest in myself title to any part of the corpus of any trust fund as from time to time constituted.

The words are clear and unambiguous.

In executing the December 27, 1934, instrument Crosley was attempting to make use of the not uncommon estate-planning device, the irrevocable life insurance trust. There is no secret about that; he was, among other things, attempting to reduce his potential estate tax. The life insurance trust has been recognized as a tax-saving tool of estate planning for decades. Paul, Federal Estate and Gift Taxation, sec. 10.04, fn. 2; Polisher, Estate Planning and Estate Tax Savings 542–544. See also Hanna, "Some Legal Aspects of Life Insurance Trusts," 78 U. Pa. L. Rev. 346 (1930).

For an insured person willing to part with control over his policy, such a trust not only removes the insurance proceeds from his estate but may also be drafted to keep the proceeds out of the estates of those beneficiaries who will receive the benefit thereof for as long as the trust may be permitted to live under local rules against perpetuities. See

Yohlin and Bomze, "Some Unresolved Gift and Estate Tax Problems of the Unfunded Irrevocable Insurance Trust," 41 Taxes 521 (1963).

To remove the insurance from the insured's estate there must be a complete and irrevocable assignment of all incidents of ownership. In *Anna Rosenstock*, 41 B.T.A. 635 (1940), acq. 1942–1 C.B. 14, we held that a mere oral assignment along with physical delivery of the policies to the assignee was sufficient to divest the insured of all legal interest in the policies there involved. In *Farwell* v. *United States*, 243 F. 2d 373 (C.A. 7, 1957), the decedent-insured had established a trust and named the trustees as beneficiaries of certain of his life insurance policies. It was held that the insurance proceeds were includable in decedent's gross estate since he had not *assigned* the policies to the trustees and, therefore, had not divested himself of the right to change beneficiaries. Accord, *Seward's Estate* v. *Commissioner*, 164 F. 2d 434 (C.A. 4, 1947), affirming a Memorandum Opinion of this Court. See also *St. Louis Union Trust* v. *United States*, 262 F. Supp. 27 (E.D. Mo. 1966).

In the instant case the trust was not merely created by written trust agreement but legal title to the policies themselves was assigned without restriction; there was no mere oral assignment, but a formal trust instrument (which could not be altered, amended, or revoked) was executed, in which the insured unambiguously abrogated all of his right, title, and interest in the policies, and in which he directed that in no event were his trustees to permit any reversion of interest to him. Formal assignments were also then executed for each policy on insurance company forms filed with and accepted by each of the companies here involved and subsequently attached to each respective policy. The record reveals no attempt whatsoever on the part of Crosley to exercise any incident of ownership subsequent to the December 1934 trust and assignment of the policies.[6] What is it, then, about Crosley's estate-planning job that seems to have triggered respondent's challenge? Neither from the deficiency notice nor from the pleadings herein nor the briefs is it ever made clear exactly what the respondent's theory of the case is. He just does not like the idea that over $1 million of insurance proceeds under policies bought and paid for by decedent escape the estate tax net.

From our reading of respondent's brief, it appears that he is highly concerned over and suspicious of the manner in which the trust document limits the powers of the trustees over the policies. He contends

<hr>

[6] Although there is some evidence of record tending to indicate that Crosley may have retained access to or custody of some of the policies subsequent to their assignment, we do not consider this evidence, in the circumstances here present, as a significant indication that the assignment in trust was not intended to be binding and effective. Actual delivery of an assigned policy to the assignee is not essential to the validity of the assignment, 30 Ohio Jur. 2d 394, any more than it effects an assignment. *Commissioner* v. *Noel Estate*, 380 U.S. 678 (1965).

that the trustees' only power was to irrevocably designate beneficiaries (from within a limited group) and determine terms of settlement and that they possessed none of the other incidents of ownership. Since the trustees did not acquire the incidents of ownership, and since no one else did either, he argues, the trust was a meaningless facade to hide the reality that Crosley actually retained the incidents all along. Respondent theorizes that incidents of ownership are "intangible property rights" which cannot be forfeited or suspended, and "unless title to intangible property has vested in some person other than the decedent, it is taxable in his estate." Whatever one may think about such theories, which make difficult reading indeed, the evidence of record here clearly supports our conclusion that all incidents of ownership of the policies here in issue passed to and vested in the trustees.

After unambiguously assigning the policies to the trustees, the trust instrument goes on to impose certain duties upon the trustees. There are no specific words denying the trustees the power to exercise any of the incidents of ownership which would pass to them upon an absolute assignment. On the contrary, the terms of the trust are amply broad to permit the trustees to deal with the policies as the owners thereof. Respondent ignores and would have us close our eyes to the provision of the trust specifically authorizing the trustees to enter such an agreement with the issuing company "in their discretion" with respect to "the rights of any person under said policy" as they deem advisable. The only limitation on this broad discretionary power is that any agreement made by the trustees shall provide "that none of said policies or the proceeds thereof shall in any manner inure to said Powel Crosley, Jr., and said trustees shall in said contracts designate as beneficiary one or more members of the family of the said" Crosley. As we construe the trust, the sole limitation upon the exercise of the incidents of ownership results from the fact that those incidents are owned by and subject to the terms of a trust—not from any failure of the incidents to pass from assignor to assignee.

The trust was amply broad in its terms to permit the trustees to contract with the issuing company "in their discretion" that *anyone except Crosley* was the owner of the policy or possessed all or various of the incidents of ownership therein; with the further exception of the establishment of a class of family members from which the beneficiary of a policy was to be named, there was no other limitation on the trustees' discretionary power.

One clear indication that the trustees possessed incidents of ownership is the fact that the trustees reassigned title to four of the policies to members of Crosley's family. Clearly, one incident of ownership is the ability to assign ownership to a third person. The trustees made such assignments of the two Equitable Life policies, the Mutual

Life policy, and the Penn Mutual policy, and such assignments, without any action being taken by Crosley, were accepted by these three insurance companies. Without doubt similar action, in the trustees' discretion, could have been taken with respect to the other policies.

Respondent places much weight upon evidence submitted from the files of the various insurance companies with respect to the policies in question. The files of a number of the companies here involved contain correspondence and legal memoranda dated in 1934, 1935, and 1936, in which questions are raised as to the powers of the trustees. Respondent asserts that these files demonstrate that most of the insurance companies questioned the effectiveness of Crosley's transfer of the incidents of ownership to the trustees.

We have carefully examined this evidence as well as the other evidence of record and we are convinced that with one possible exception, respondent has misconstrued the nature of the problems discussed therein. As we read these files, there were no questions raised as to the validity and effectiveness of the conveyance of title to the policies (and concomitant passage of the incidents of ownership therein) to the trustees; rather, the questions raised relate only to the scope of the trustees' power under the terms of the trust and to whether the settlement agreements proposed by the trustees violated company policy or local law. Only one company questioned whether there had been a complete and effective assignment of the policies to the trustees divesting Crosley of all incidents of ownership.

Thus, almost without exception the insurance companies did not doubt that the trustees possessed the incidents of ownership; they were merely apprehensive about the manner in which the trustees sought to exercise or deal with those incidents. As already pointed out, respondent construes the failure of the trustees to exercise all incidents of ownership as meaning that those incidents did not actually pass to the trustees, but remained in Crosley. Neither the failure to exercise ownership nor even a momentary or temporary inability to exercise it matters. It is only important whether or not a decedent possessed at his death any of the incidents of such ownership in a general, legal sense. *Commissioner* v. *Estate of Marshal L. Noel*, 380 U.S. 678, 684 (1965). Here, the evidence before us clearly establishes that Crosley had divested himself completely of all of such incidents many years before. We can only conclude that he possessed none of them at his death, irrespective of what the trustees may or may not have done with them in the many intervening years.

There can be no question that the owner of property may transfer property in trust and establish a trust in such a manner as to severely limit the power of the trustees to exercise the usual rights of an absolute owner. For example, the owner of shares of stock normally has

the right to vote the stock, to sell or exchange the stock, to pledge the stock, etc. Such a stockholder could transfer title of his stock to a trust, and by the terms of the trust he could prohibit the trustees from selling or pledging or exchanging the stock and could even require them to vote the stock in a certain manner or to give him (the settlor) a proxy to vote the stock. See 2 Scott, Trusts 1460 (2d ed.). Even with all of these restrictions, no one would seriously dispute that the trustees held legal title to the stock and all the incidents attendant thereto, and no one should contend that the settlor retained the incidents of ownership merely because the trustees were limited by the terms of the trust from exercising them freely. Yet respondent appears to be making just such an argument with respect to the insurance policies here involved.

For purposes of this case we are concerned not with whether the trustees possessed all of the incidents of ownership to be employed and enjoyed without restriction but whether the decedent effectively ridded himself of them. This key question was stated as follows in *Estate of Louis J. Dorson*, 4 T.C. 463, 468 (1944), petition for review dismissed (C.A. 2, 1945):

As to the policies here under consideration, our question is whether by transferring them to the trustees under the trust agreement decedent irrevocably divested himself of all property rights in them, including the right to change the beneficiaries or to pledge or surrender the policies. If so, then the proceeds of the policies must be excluded from his gross estate. See *Anna Rosenstock*, 41 B.T.A. 635, and cases therein cited.

If the insured effectively divested himself of the incidents of ownership prior to his death, then at the time of his death he no longer possessed any rights of beneficial or economic enjoyment in the property, and, therefore, the death of the insured does not cause the cessation of his beneficial enjoyment of the property. As stated by Justice Holmes in *Edwards* v. *Slocum*, 264 U.S. 61, 63 (1924), the estate tax "taxes * * * 'not the interest to which some person succeeds on a death, but the interest which ceased by reason of the death,' " and (p. 62) "It comes into existence before and is independent of the receipt of the property by the legatee." Accord, *Chase National Bank* v. *United States*, 278 U.S. 327 (1929); *Ballard* v. *Helburn*, 9 F. Supp. 812 (W.D. Ky. 1933), affd. 85 F. 2d 613 (C.A. 6, 1936).

Respondent, pressing his attack on all flanks, contends that the trust which Crosley attempted to establish is invalid as a matter of trust law and that, therefore, the asignees (the would-be trustees) of the policies must be deemed to have held any incidents of ownership deemed transferred to them upon resulting trust for the benefit of Crosley. We find this argument unconvincing. The fact that the trustees did not deem it advisable to exercise their discretionary power

to deal with the rights "of any person under said policy" (including the insured and former owner) could not possibly be construed as revesting either legal or equitable title in the grantor. This is particularly evident because of the express direction in the trust that the trustees' settlement agreements were to provide that neither the policies nor any proceeds thereof should thereafter inure to Crosley's benefit.

The December 27, 1934, trust instrument was executed in Ohio by a resident of Ohio, and it specifically provided that it was to be governed by Ohio law. The parties agree on brief that the Ohio law governs. As a general proposition, Ohio follows the common law as to the creation of an inter vivos trust and the duties of the trustees thereunder. *Fricke* v. *Weber*, 145 F. 2d 737, 739 (C.A. 6, 1944). The basic requirements for the formation of a valid trust under Ohio law are: (a) A competent settlor and a person or persons capable of holding as trustee, *Jones* v. *Luplow*, 13 Ohio App. 428, 431 (1920); see 1 Scott, Trusts 176 (2d ed.); (b) a declaration of trust which sets out the terms of the trust and evidences a present intent to create it, *Miller* v. *Bowers*, 163 Ohio St. 421, 127 N.E. 2d 201 (1955); *Ulmer* v. *Fulton*, 129 Ohio St. 323, 195 N.E. 557 (1955); (c) *a trust res or corpus*, *Fulton* v. *Gardiner*, 127 Ohio St. 77, 186 N.E. 724 (1933); see Restatement, Trusts, sec. 66 (2d ed.); (d) a beneficiary, *Gottlieb* v. *The Mead Corporation*, 72 Ohio L. Abs. 283, 134 N.E. 2d 857 (1955); see Restatement, *op. cit. supra* sec. 66; and (e) a separation of the legal and equitable ownership of the trust res, *Hill* v. *Irons*, 160 Ohio St. 21, 113 N.E. 2d 243 (1953); see 1 Scott, Trusts 41 (2d ed.).

Respondent maintains that Crosley did not intend to create a trust, that there was no trust corpus or res, that no one had "equitable title to the 'incidents of ownership'" (whatever that may mean), and that the trust had no purpose. We disagree with all elements of this approach in the light of the evidence of record.

The evidence leaves no doubt that Crosley intended to create a trust. The December 27, 1934, trust instrument clearly states such intent. All of the correspondence from the insurance company files reveals a persistent effort on the part of Davidson, acting as agent for Crosley and the trustees to effectuate the terms of the trust. Crosley never took any action inconsistent with his intent as expressed in and evidenced by the trust instrument. Respondent has attempted to place great weight on documentary evidence that 7 days prior to the execution of the December 27, 1934, instrument Davidson wrote to some [7] of the insurance companies stating Crosley's intention to estab-

---

[7] Some but not all of the insurance company files admitted into evidence contain this letter. Though it might be inferred that the same letter was written to all of the insurance companies here involved, this is not determinable from the evidence of record.

lish a life insurance trust and then wrote back on December 27, instructing the companies to disregard his prior letter. This evidence cannot be construed to indicate that Crosley did not intend to create a trust when on the same day that the second letters were written he executed the trust instrument which was accepted as creating a valid trust by the same insurance companies to which the letters were written.

Since the original letters of December 20 gave detailed instructions as to how the trust was to be established and since the trust as eventually established varied from the outline contained in the December 20 letter, the December 27 letter stating that the earlier letter should be disregarded was undoubtedly written because of this variation in format, not because of any decision by Crosley not to create a trust. Furthermore, respondent's argument that Crosley did not really intend to create the trust, though he made it appear as if he did, is largely "bootstrap" in that it proceeds from the asserted conclusion that Crosley and Davidson had devised a deliberately confused sham transaction in which it would be made to appear that Crosley was assigning the policies, but in reality he would retain the incidents of ownership.

The trust corpus or res in the instant case, as it is in the case of every life insurance trust, was the life insurance policies. As already discussed at length, the fact that the trustees were restricted in their powers to deal with the policies, does not mean that they did not receive effective legal title to them. It is clear without question that life insurance policies may serve as a trust res.[8] 1 Scott, Trusts 637 (2d ed.) ; cf. *Stone* v. *Guardian Trust Co.*, 22 Ohio L. Abs. 663. Even if we were to find that the trust failed for lack of a trust res we would not be able to accept respondent's conclusion that this resulted in a trust in favor of Crosley. There can be no resulting trust when there is no res to which it could attach.

Respondent's allegation that the trust had no purpose is also without merit. It provided financial security for members of Crosley's family and certain nontax advantages. It protected the policies from creditors and prevented the beneficiaries and the insured from obtaining and dissipating the cash surrender values. Even if tax savings were a motive, as it is in most estate-planning situations, the taxpayer is not required to take the path which involves the highest tax cost.

Respondent stresses certain evidence which indicates that some of the companies initially viewed the December 27, 1934, arrangement as merely the creation of a power of attorney in the three persons de-

---

[8] In *Farwell* v. *United States*, 243 F. 2d 373, 377 (C.A. 7, 1957), it is stated that the "expectancy" created by a mere revocable designation of trustees as beneficiaries without an assignment of the policies to the trustees was sufficient res to support a valid trust.

scribed as "trustees" to appoint or designate the distribution of the insurance proceeds among specified family members. We cannot take this view because it was once held by some of the companies. Eventually all of the companies accepted an outright assignment to the trustees. Upon Crosley's death the proceeds were distributed as the trustees had directed.

Respondent urges further that even if the trust was valid and effective initially, it later terminated upon the execution by the trustees of settlement agreements with all of the insurance companies. We cannot agree. After execution of the settlement agreements the trustees held title to the policies and the incidents of ownership (with the four exceptions mentioned hereinabove), although the terms of their trust may be construed so as to prevent their exercising the undisposed of incidents of ownership. At the very least, their retention of the incidents served Crosley's purpose of keeping those incidents out of his own hands and at the same time out of the hands of his designated class of trust beneficiaries.

Thus, the trust did not terminate by its own terms. Respondent maintains that it terminated as a matter of law and that a resulting trust arose in favor of Crosley. However, a trust does not result for the settlor where an inter vivos trust terminates because the trustees have carried out all their duties. Resulting trusts occur only when a trust fails in its inception or becomes impossible of performance before the trustees have performed their duties. 53 Ohio Jur. 2d 588; 4 Scott, Trusts 2922 (2d ed.); Restatement, Trusts, sec. 440 (3d ed.). In Ohio it is well settled that the "doctrine of a resulting trust is based on a presumed intention of the Testator, and is never permitted to rise when it is manifestly against the intention of the Testator." *Tinney* v. *The Cleveland Trust Co.*, 30 Ohio App. 346 (syllabus 6); 53 Ohio Jur. 2d 588. The trust instrument and other evidence of record clearly indicate Crosley's intention to completely and forever divest himself of all incidents of ownership. In all events, none of the policies or their proceeds were to inure to Crosley. Thus, even if the trust had terminated as a matter of law, any undisposed of incidents of ownership would undoubtedly have passed to the trust beneficiaries, or have been held upon a different trust, or retained by the "trustees" free of trust—rather than be revested in, or held upon resulting trust for Crosley. 4 Scott, Trusts 2935–36 (2d ed.).

Respondent argues further that if "all documents and transactions are as purported * * * Crosley retained 'incidents of ownership' at death as a result of the terms of the insurance policies" which provide generally that the *insured* is to have certain powers (i.e., power to obtain cash surrender value, to borrow on the policy, to change beneficiaries, etc.). These clauses are part of the standard provisions of

the respective policies; they contractually establish the incidents of ownership which always initially reside with the insured who takes out the policy. Although the policies specifically grant these rights to the insured, obviously any powers and rights so granted must be subject to the rights of any assignee of the insured. 30 Ohio Jur. 2d 395. In the instant case the rights specifically granted in the policies to Crosley as the insured were subject to the rights of the trustees as the assignees of Crosley. As trustees they had the express authority to contract with respect to the rights of the insured under the policy as well as any other person. Respondent's argument is completely without merit.

We hold that the December 27, 1934, trust was valid; that all of the insurance policies here in issue were effectively transferred to the trustees of that trust; that Crosley retained no incidents of ownership in any of the policies, nor did he own or possess any at the time of his death; and that, therefore, section 2042 is inapplicable in this case.

Respondent presents virtually no argument on brief in support of his alternative reliance on sections 2036 and 2038. Perhaps this is so because much of the same argument made with respect to section 2042 underlies respondent's contention that 2036 and 2038 apply.[9] Section 2036 includes in the gross estate property transferred by a decedent, by trust or otherwise, subject to a retained life interest. A life insurance policy cannot be includable under this section unless by the terms of the trust instrument or a collateral understanding, written or oral, with the trustees, Crosley retained the legal right to possess or enjoy the policy or the income therefrom, or to designate, either alone or in conjunction with another, the person or persons who shall possess or enjoy the policy or the income therefrom. As already held above, Crosley did not retain any interest in any of the policies here involved.

Section 2038 makes a part of the gross estate property transferred by a decedent by trust or otherwise, if the enjoyment thereof was subject, at decedent's death, to change through the exercise of a power, either by decedent alone or in conjunction with another, to alter, amend, or revoke, or where decedent has relinquished such a power in contemplation of death. Respondent has conceded at trial that he has the burden of proving facts (that Crosley had such a power at the time of his death or relinquished such a power in contemplation of death) that would make a policy taxable under this section. Regardless of who has the burden of proof, the record clearly establishes that Crosley had no such power with respect to any of the policies here involved.

[9] The overlap of sec. 2042 (and its 1939 Code predecessor, sec. 811(g)) with secs. 2036 and 2038 (and their 1939 Code predecessor, sec. 811(c)) is pointed out in *Estate of Myron Selznick*, 15 T.C. 716, 729 (1950), affirmed per curiam 195 F. 2d 735 (C.A. 9, 1952); and Paul, Federal Estate and Gift Taxation, sec. 1039, (1946 supp.).

Respondent relies upon *Seward's Estate, supra,* and *Goldstone* v. *United States,* 325 U.S. 687 (1945). Both of these cases held section 811(c) of the 1939 Code, the predecessor of sections 2036 and 2038 of the 1954 Code, applicable to certain insurance policies. However, these cases are not controlling here since in both of them it was clearly held that the decedent had retained significant incidents of ownership.[10] See *Estate of Louis Richards,* 20 T.C. 904 (1953), affirmed per curiam 221 F. 2d 808 (1955), acq. 1954-1 C.B. 6. We have already held that Crosley retained no incidents of ownership. While we recognize that sections 2036 and/or 2038 may be applicable in situations where section 2042 is not applicable (e.g., *Goldstone* v. *United States, supra*), we have been referred to no case where 2036 or 2038 was applied to insurance policies in which the decedent retained no incidents of ownership.

In addition to our holding stated above that section 2042 does not apply here, we hold also that sections 2036 and 2038 are not applicable, and that respondent erred in including any of the proceeds of the policies in question in decedent's gross estate. To reflect stipulated settlement of issues regarding valuation of certain real property and any other required adjustments,

*Decision will be entered under Rule 50.*

---

[10] The *Seward's Estate* case also held applicable the predecessor of sec. 2042, for the same reasons that sec. 811(c) applied: Retention by the decedent of incidents of ownership.