**In re David STEPHENS and Sherrie Raye Stephens, Debtors.**

**AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, LOCAL 2051, Appellant,**

v.

**David STEPHENS and Sherrie Raye Stephens, Appellees.**

**Thomas DELANY, Beverly Delany and Delany Insurance Agency, Inc., a California corporation, Plaintiffs and Appellees,**

v.

**David STEPHENS and Sherrie Raye Stephens, individually and dba Excess Risk Management, Ltd., et al., Defendants.**

**BAP No. CC–84–1003 VAbM.**
**Bankruptcy No. LA 83–05588 CA.**
**Adv. Nos. LA–83–9442 CA, LA–83–8534 CA.**

United States Bankruptcy Appellate Panels of the Ninth Circuit.

Argued March 21, 1985.

Decided August 15, 1985.

Catherine Adams Bennett, Lenrigo, Walters, Snyder, Nibler, Moss & Berryman, Fresno, Cal., for appellant.

David J. Landecker, Fischer, Hill & Sandford, Santa Barbara, Cal., for appellees.

Before VOLINN, ABRAHAMS and MEYERS, Bankruptcy Judges.

## OPINION

VOLINN, Bankruptcy Judge.

### I. INTRODUCTION

This dischargeability proceeding was brought by American Federation of State, County and Municipal Employees, Local 2051 (Union) against the debtors, David

Stephens and Sherrie Raye Stephens (Stephens). The particular grounds alleged involve fraud under 11 U.S.C. § 523(a)(2)(A), breach of fiduciary duty under § 523(a)(4), and intentional conversion under § 523(a)(6).

The complaint alleges that Stephens wrongfully and intentionally withdrew $87,127.68 from funds entrusted to him by the Union for the purpose of obtaining "stop-loss insurance" to provide excess coverage for its self-funded employee benefit health plan; that thereafter he intentionally converted and retained $48,204.92 of this sum for his own personal use; and that such wrongful act created a nondischargeable debt under the Bankruptcy Code. Stephens' answer denied these claims.

Stephens moved for summary judgment, contending that he had obtained a valid stop-loss insurance policy for the Union from the Carlisle Insurance Company (Carlisle), which is not a party to this action, and that, in any event, the Union has suffered no damage because no excess claims ever arose against the risk which would have been insured by such a policy. Stephens was joined in his motion for summary judgment by Thomas Delany, Beverly Delany, and Delany Insurance Agency, Inc., (Delany), Thomas Delany once having been the Union's health benefit plan administrator and a business partner of Stephens.

The Bankruptcy Court, pursuant to local practice in the Central District of California, entered findings of fact and conclusions of law and granted summary judgment in favor of Stephens. The Union appeals.

## II. FACTUAL BACKGROUND

### A.

The Union is a voluntary, unincorporated association representing approximately 1,000 public employees employed by various municipalities in Fresno and Madera counties in California. In 1980, in order to provide health insurance benefits for its members in these two counties, Local 2051 established a self-funded employee benefit plan known as the American Federation of State, County and Municipal Employees Local 2051 Health Benefit Plan (Plan). Members of the Executive Board of Local 2051 serve as trustees of the Plan.

The Plan was administered by Delany under a written "Agreement for Risk Management Services" dated August 7, 1980 between Delany Insurance Agency, Inc., a Risk Management Services Organization (RMSO),[1] and the Union. Pursuant to Paragraph I.7 of that agreement, RMSO was to act as "Broker of Record" in representing the Union in obtaining "all required stoploss and life insurance coverages."

The Union, in a separate written agreement with David Stephens, dated August 4, 1980, referred to him as "Consultant" and described him as "an individual engaged in the business of consulting and documenting self-funded plans of the type required by the CLIENT [Union] at this time." Paragraph 7 of that agreement provides: "CONSULTANT [Stephens] will assist CLIENT [Union] and the contracted Risk Management Services Organization in coordinating the obtaining of appropriate stoploss and life coverage as a part of the self-funded plan."

The purpose of stop-loss insurance coverage, according to the Union's complaint, was to protect the Plan from extraordinary individual or aggregate claims which might otherwise exhaust the Plan's assets. Stephens' affidavit explains that "aggregate" stop-loss insurance is group deductible insurance. If the group claims exceed the

---

**1.** Sometime during 1982 Stephens formed a partnership with Delany to do business as Risk Management Services Organization (RMSO), the name under which Delany had been doing business alone. The parties dispute the date on which this partnership was formed; the Union contends it was as early as March 30, and Stephens contends it was not formed until about August 24. Similarly, the parties dispute the validity of a written agreement between the Union and RMSO dated July 1, 1982, under which RMSO—not Delany—was to administer the Plan. Stephens suggests it is valid; the Union contends it is not.

specified deductible, then the aggregate stop-loss insurance policy takes over. "Specific" stop-loss insurance, on the other hand, refers to personal deductibles. If one person covered by the plan has total claims exceeding a specified deductible, then the specific stop-loss insurance policy takes over. According to Stephens' affidavit, stop-loss insurance coverage for self-funded insurance programs was his particular area of expertise.

### B.

At issue in this appeal is the validity of an aggregate "Stoploss Agreement" dated July 1, 1982, which was executed by Stephens purportedly on behalf of Carlisle and by Vernon Neuman on behalf of the Union. Stephens was an appointed agent and underwriting manager for Carlisle from January 1 through September 10, 1982, but the parties dispute his authority to issue this alleged policy on behalf of Carlisle. This question will be explored in further detail below.

It is undisputed, however, that Carlisle never received any of the money that the Union paid to Stephens as premiums for the alleged policy. The parties dispute whether Stephens was legally entitled to retain any of this money, another question that will also be explored in further detail below.

Both parties agree that Stephens used some of the money he received from the Union—$38,922.76—to obtain a *specific* stop-loss insurance policy, effective September 1, 1982, from Republic National Life Group Insurance Company (Republic), which is not a party to this action. The Union's complaint takes this sum into account, but alleges that it was without any stop-loss coverage between June and August 1982 as a result of its reliance upon Stephens' misrepresentations and that Stephens' indebtedness to it for the remaining $48,204.92 is nondischargeable.

### III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure, pertaining to summary judgment, applies to adversary proceedings in bankruptcy. BR 7056. A reviewing court will affirm a grant of summary judgment only if it appears from the record, after viewing all evidence and factual inferences in the light most favorable to the nonmoving party, that there are no genuine issues of material fact and that the moving party is entitled to prevail as a matter of law. *Heiniger v. City of Phoenix*, 625 F.2d 842, 843 (9th Cir.1980).

Summary judgment is not to be granted lightly and is not a substitute for the trial of disputed issues of fact. *In re Combs*, 40 B.R. 148, 151 (Bankr.W.D.Va.1984). Fraud claims, in particular, normally are so attended by factual issues (including those related to intent) that summary judgment is seldom possible. *Garter-Bare Co. v. Munsingwear, Inc.*, 650 F.2d 975, 981 (9th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 381, 83 L.Ed.2d 316 (1980). In nondischargeability actions, particularly, the Bankruptcy Court is reluctant to draw factual inferences relating to state of mind when ruling on motions for summary judgment. *In re Toscano*, 23 B.R. 736, 740 (Bankr.D.Mass.1982).

■ The summary judgment before us is accompanied by Findings of Fact and Conclusions of Law, which may be dispensed with pursuant to Fed.R.Civ.P. 52(a), made applicable in adversary proceedings through B.R. 7052. Because of the nature of summary judgment, such "findings" are not findings of fact in the conventional sense that the trial court has weighed the evidence and resolved disputed factual issues. The "clearly erroneous" standard of B.R. 8013 is therefore inapplicable.[2] *See Heiniger, supra,* at 844; *Tygrett v. Wash-*

---

**2.** The practice of identifying facts not in dispute as findings has been received with both approval, *see, e.g., Abramson v. Univ. of Hawaii,* 594 F.2d 202, 210 (9th Cir.1979), and criticism, *see, e.g., Garter-Bare Co. v. Munsingwear, Inc.,* 650 F.2d 975 (9th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 381, 83 L.Ed.2d 316 (1980); *Trowler v. Phillips,* 260 F.2d 924, 926 (9th Cir.1958); and *AR Inc. v. Electro-Voice, Inc.,* 311 F.2d 508, 513 (7th Cir.1962).

*ington,* 543 F.2d 840, 844 n. 17 (D.C.Cir. 1974); 9 Wright & Miller, Federal Practice and Procedure § 2575 at 693 (1971). Rather, this court stands in the same position as the court below in applying the standards set forth in Rule 56(c). *See* 10 Wright, Miller & Kane, Federal Practice and Procedure § 2716 at 643 (2d ed. 1983).

■ We also must reject Stephens' contention that because this is a bankruptcy case, the normal summary judgment rules—particularly the requirement that we view the evidence and draw any factual inferences in the light most favorable to the nonmoving party—do not apply. It is true that the burden of proving nondischargeability is upon the one alleging it. It is also true that the statutory exceptions in Section 523 are to be strictly construed against the objecting creditor and liberally in favor of the debtor. *See In re Klapp,* 24 B.R. 598, 599 (Bankr. 9th Cir.1982). These rules, however, are more appropriately applied in the context of a trial or hearing on disputed issues of fact, and cannot operate to suspend the normal rules pertaining to review of the granting of summary judgment.

## IV. DISCUSSION

It is apparent that the primary issue before us is whether any genuine issues of material fact exist that would preclude entry of summary judgment. This panel has before it for review the record considered by the court below. This record consists primarily of the complaint, the answer, the motion for summary judgment, the parties' legal memoranda, the supporting affidavit of David Stephens, and three opposing affidavits submitted by the Union: that of Sara Hedgpeth-Harris, an employee of counsel for the Union; that of Arthur C.

Lopez, a Union member and a member of its executive board since September 1980; and that of Frank V. McCullough, the president of Carlisle.

### A.

■ All three of the claims asserted in the Union's complaint involve the element of intent, whether it is the intent to deceive under § 523(a)(2)(A) *(see, e.g., In re Norton,* 34 B.R. 666 (Bankr.D.Ariz.1983)); or the fraudulent intent to misappropriate another's property, *i.e.,* embezzlement[3] under § 523(a)(4) *(see, e.g., In re James,* 42 B.R. 265 (Bankr.W.D.Ky.1984)); or the intentional conversion of another's property, *i.e.,* a willful and malicious injury under § 523(a)(6) *(see, e.g., In re Hazelwood,* 43 B.R. 208 (Bankr.E.D.Va.1984)).

Two interrelated factual issues material to proof of Stephens' intent are (1) Stephens' credibility as to his authority, if any, to bind Carlisle, and therefore (2) Stephens' justification, if any, for retaining money paid over by the Union as premiums. The Bankruptcy Court entered the following relevant findings of fact:

5. DAVID STEPHENS was the agent and insurance underwriting manager of Carlisle Insurance Company, and at all times was apparently acting within the scope of his agency and underwriting authority to issue insurance policies in the State of California on behalf of Carlisle Insurance Company.

12. Thereafter [after June 1982] said funds [that the Union had deposited with RMSO for purpose of obtaining stop-loss insurance coverage] were paid by RMSO to Defendant DAVID STEPHENS, who then was, or had good reason to believe he was operating as the lawful authorized agent and underwriting manager for

---

**3.** Although the complaint and briefs emphasize the allegation of fraud or defalcation while acting in a fiduciary capacity, we agree with Stephens that this clause is limited to fiduciary relationships arising from an express trust, which was not present in this case. *See* 3 Collier on Bankruptcy ¶ 523.14[1][c] at 523–108 (15th ed. 1985). Nevertheless, it is clear that the exception applies to *all* cases of embezzlement,

regardless of whether the debtor was acting in a fiduciary capacity. *Id.* ¶ 523.14 at 523–103, 108. Embezzlement has been defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Id.* ¶ 523.14[3] at 523–116. An allegation of embezzlement could be found within the complaint before this court.

Carlisle Insurance Company, and other carriers, through the funding conduit known as ERM Limited.

13. Thereafter, said funds, or a portion thereof, were used on July 1, 1982, by Defendant to obtain stop-loss insurance coverage and to issue a stop-loss insurance policy, through Carlisle Insurance Company, covering Plaintiffs. Said acts by Defendant DAVID STEPHENS were properly performed by Defendant in his capacity as the authorized agent and underwriting manager for Carlisle Insurance Company.

14. Defendant paid said funds to appropriate insurance agencies, after deducting therefrom commissions and fees owing to him.

15. At no time did Defendant wrongfully and intentionally convert money owing to Plaintiff to his own use.

17. Defendant performed no acts maliciously, fraudulently, or with oppression.

We will now discuss the record on which these findings were based.

1. *Stephens' credibility as to his authority, if any, to bind Carlisle*

■ The question of Stephens' authority to bind Carlisle is addressed in three particular areas of the record: (1) affidavits, (2) certain letters from Carlisle to Stephens (and others) attached to affidavits, and (3) Stephens' Underwriting Manager's Agreement with Carlisle.[4]

The affidavits of Stephens and McCullough are in direct conflict on the question of Stephens' authority to bind Carlisle. Stephens' affidavit declares:

At all times herein mentioned, I had, or at least was led to believe that I had full authority to issue a stop-loss insurance policy to the American Federation of

State, County, and Municipal Employees, Local 2051 (hereinafter "AFSCME").

McCullough's affidavit, however, states that "Carlisle authorized Stephens to write group accident and health insurance policies, in Santa Barbara and San Luis Obispo Counties *only*, through MD Foundation, in Santa Barbara." As noted above in Section II of this opinion, the Union operates only in Fresno and Madera counties. McCullough's affidavit declares:

7. With respect to the alleged agreement referred to in paragraph 5 above and attached hereto [the stop-loss agreement], I know that David Stephens was *never* authorized by Carlisle to issue that policy or any policy in Fresno County, and was never authorized to *sign* any policy on behalf of Carlisle.

. . . .

11. I also have knowledge that no policy was issued by Carlisle Insurance Company in July of 1982 or at any other time which covered A.F.S.C.M.E. Local 2051 for aggregate stop-loss...

It would be difficult to present a more sharply stated case of factual dispute. We suspect that the waters were muddied for the Bankruptcy Court by the submission of certain letters containing passages that appear relevant to the issue of Stephens' agency; specifically, a letter dated August 4, 1982 from McCullough to Stephens, a letter dated August 10, 1982 from Richard W. Bender, Executive Vice President of Carlisle, to Stephens, and a letter dated November 11, 1982 from Bender to Ron Manfredi, the Assistant City Administrator for the City of Madera, California. Although the August 4 letter seems to indicate that Stephens could write aggregate stop-loss coverage in the Fresno area, the August 10 letter, while it may be read to

---

**4.** The Underwriting Manager's Agreements between Stephens and Carlisle, one covering January to June 1982, and the other one covering from June 1, 1982 until its termination by Carlisle as of September 10, 1982, each provided that Stephens was "hereby appointed for the purpose of soliciting applications for the insurance of such risks as the COMPANY [Carlisle]

shall first approve and of the classes which the COMPANY may be lawfully authorized to issue within the State of California." (¶ 1)

Paragraph 2 provided that Stephens had "full power and authority to: (A) Receive and accept proposals for insurance covering such classes of business as are previously approved by the COMPANY [Carlisle]."

provide authority for a few days not relevant here, substantially undermines the August 4 letter. The August 10 letter refers to agreements or understandings between Carlisle and Stephens apparently existing before August 4 which did not empower him to write or issue policies but allowed him only to solicit business in the Fresno area subject to home office approval. Moreover, the Union presented evidence, through an excerpt from the deposition of Vernon Neuman in a related state court action (see footnote 4 below), that the alleged stop-loss policy may not have been executed until *after* the August 10 letter which confirmed prior communications advising Stephens that he had no authority. Neuman testified that he did not execute the alleged stop-loss policy until 10:30 P.M., after a social function which occurred "right around" the time of his resignation as the Union's president; the resignation was dated August 11, 1982, and effective August 16, 1982.

All of this evidence as to whether Stephens knew or did not know of his authority to issue a policy is less than clear-cut. In any event, there is substantial dispute on this basic factual issue.

2. *Stephens' justification, if any, for retaining money paid over by the Union as premiums*

██ At the outset it should be noted that Stephens parted with a portion of the premiums to buy specific stop-loss insurance with an insurer other than Carlisle. It is not clear from the record as to just how much of an offset he claimed against Carlisle and whether the approximately $48,000.00 he retained for himself was the full extent of the offset. It is also not clear as to what the premiums should have amounted to for the Carlisle policy he alleges he wrote. Finally, the reasons for his having obtained a policy from Republic when he believed that a binding policy from Carlisle had been issued have not been explained.

According to the affidavit of Thomas Delany[5], between June 8 and November 18, 1982, the Plan issued six checks totaling $87,127.68 made payable to either "Robis International" or "E.R.M. Ltd." (Excess Risk Marketing, Ltd. was represented to be a partnership of Stephens and Mark Robis of Robis International Insurance Brokers, Inc., according to the affidavit). Delany's affidavit further states:

> All of the above money represented by Exhibits 1–6 hereto [cancelled checks] were paid by the Plan, at my direction, *based on David Stephens' express representation that those moneys were required by him, and would be used by him, solely to purchase aggregate and specific stop loss and life insurance* in connection with, and for the benefit of, the Plan and its members to insure the Plan against extraordinary claims. (Emphasis supplied.)

According to the affidavit of Frank V. McCullough, president of Carlisle, which affidavit was submitted by the Union, "Carlisle has never received any money, in the form of a binder, premium, or in any other form, in connection with the alleged 'Stoploss Agreement.'"

Stephens' affidavit acknowledges that he collected premiums from the Union amounting to $86,357.68 (which is slightly lower than the figure claimed by the Union), and that "I did not remit premiums immediately to Carlisle, because I was attempting to replace the Carlisle coverage from the inception date of July 1, 1982." Parenthetically, it may be observed that Stephens' conduct in attempting to place insurance with another insurer is more consistent with Carlisle's position that he had no authority to write Carlisle insurance on this risk than with Stephens' position that he did. In any event, instead of remitting to Carlisle, Stephens states that he set up a special account for collecting such premiums and remitting them to the various

---

**5.** The affidavit of Thomas Delany was filed in a related suit brought by the Union against Delany and Stephens in California Superior Court. The Union submitted it to the Bankruptcy Court as part of the affidavit of Sara Hedgpeth-Harris, a certified law student employed by the Union's attorney.

carriers under the name of Excess Risks Marketing (ERM). His affidavit sets forth detailed calculations in an effort to show that after subtracting his commissions and fees from the premiums he collected from the Union, there was a net deficit owing to him and therefore he was not obligated to remit any funds to Carlisle.

According to Stephens' affidavit, it was "standard procedure" to deduct commissions before forwarding premiums to the carrier and he had done it before with Carlisle on other stop-loss policies. McCullough's affidavit, however, states that Stephens "was never authorized to deduct any commissions from premiums paid by policyholders. Premiums were not to be paid to Stephens by policyholders but were to be paid to MD [Health Insurance Administrators] in Santa Barbara." McCullough's affidavit concludes:

> In Mr. Stephens' case, all premiums were to be paid directly to MD Health Plan, which in turn would pay Mr. Stephens the appropriate commission owed. Mr. Stephens' statement that he was entitled to deduct commissions prior to forwarding premiums to Carlisle Insurance Company is false, since he never sent any premiums to Carlisle on the A.F.S.C.M.E. account; it also does not accurately reflect the arrangement between Mr. Stephens and Carlisle Insurance Company and MD Health Plan.

Moreover, Stephens' associate, Delany, in his affidavit, above cited, averred that Stephens represented that he withdrew the Union premiums from the plan "solely to purchase insurance" for the Plan. It would be difficult to interpret this statement as one which would support an intention to withdraw the funds in order to assert an offset against Carlisle.

Again, the record as to Stephens' rationalization for retaining the premiums is inconsistent and sharply disputed.

### B.

Just as proof of the element of scienter is critical to a claim of fraud, so is proof that the injured party suffered damage. It is undisputed that during the relevant time period the Union did not suffer a loss that would have given rise to a claim under the alleged stop-loss policy; therefore, the Union could not have made a claim against such policy, and Carlisle would not have been put in the position of rejecting it. Stephens contends that these undisputed facts mean that the Union has not been damaged and therefore all of its fraud claims must fail. The Bankruptcy Court agreed with Stephens, and found as a fact that "[a]t no time did Plaintiffs sustain any damage by virtue of any act of Defendants STEPHENS, RMSO, or ERM Limited, or any combination thereof." (FF No. 18)

The Union contends it was damaged because it paid money to Stephens for a stop-loss insurance policy that was never issued as intended and, in any event, payment was far in excess of the actual premium due for insurance obtained on its behalf. Stephens responds that if he had "unquestionable authority" to bind Carlisle and had turned over all funds to Carlisle, the Union would be in the same position; alternatively, if Stephens had exceeded his authority, it was Carlisle who was damaged, not the Union. The Union replies that an unpaid claim would have constituted *additional* damage, and that the absence of any such unpaid claims does not mitigate or detract from the damage it has suffered through Stephens' fraudulent misrepresentations and willful conversion of funds. The Union also contends California state law is applicable, citing Cal.Civ.Code §§ 2344, 3318, 3343(a), and Cal.Ins.Code §§ 481(a)(1) and 483 [6] which imposes civil liability on insurance agents for personally retaining premi-

---

6. Cal.Ins.Code § 483 provides:

A person insured is entitled to a return of the premium:
(a) When the contract is voidable, on account of the fraud or misrepresentation of the insurer.

(b) When the contract is voidable on account of facts, of the existence of which the insured was ignorant without his fault.
(c) When, by any default of the insured other than actual fraud, the insurer did not incur any liability under the policy.

ums where no insurance was obtained even though no loss occurred.

█ It is clear that if the Union paid money to Stephens for a stop-loss insurance policy that was never issued, then the element of damage is satisfied. If this happened, the Union received nothing in exchange, while Stephens received full performance and, in a damage sense, was unjustly enriched. It would be questionable public policy to sanction breach of a duty to provide for a contingency by allowing an agent to wrongfully pocket funds which were to insure against the contingency simply because the contingency did not occur.

The more difficult question is whether the Union was legally damaged if the Bankruptcy Court, after a trial, should find that stop-loss insurance was, in effect, issued by Stephens as Carlisle's agent and was in fact binding on Carlisle. The Bankruptcy Court was obviously troubled by this problem, and correctly observed that in the event Stephens had authority, any dispute would be between Carlisle and Stephens because of his failure to remit premiums. The Union, then, would have received what it paid for, *i.e.*, stop-loss insurance coverage, and how the premiums were accounted for between Stephens and Carlisle should not be of concern to it. Correspondingly, Stephens' contention that he could offset the premiums, on his own initiative, against claims he allegedly had against Carlisle would be dependent on whether he had authority to commit Carlisle. If he did not, the premiums were converted because the Union could not receive anything for the funds.

█ However, the question of damage cannot be resolved until the Bankruptcy Court can weigh the evidence on the issue of Stephens' authority, if any, to bind Carlisle and the validity of the alleged stop-loss insurance policy. Also of particular importance in this area are the Union's allegations, in its complaint, that Stephens induced the Union to cancel its stop-loss insurance coverage by orally representing that he could obtain alternative stop-loss coverage for the Plan; and that as a direct consequence of the Union's reliance on such misrepresentations, the Union had no stop-loss coverage between June and August 1982. Stephens' answer denied all of these allegations so they are at issue. In addition, we note that the Republic policy which was eventually purchased was a specific stop-loss policy, while the Union had apparently bargained with Stephens for an aggregate stop-loss policy, and this, too, may constitute an element of damage when the issues are more fully explored at trial.

## V. CONCLUSION

The judgment on motion for summary judgment granted below in favor of Stephens is REVERSED and the matter REMANDED to the Bankruptcy Court for the Central District of California for further proceedings consistent herewith.