**In re Robert KNAPIK, Debtor.**

**Automated Handling, et al., Plaintiffs,**

**v.**

**Robert Knapik, Defendant.**

No. 02–3346.

United States Bankruptcy Court, N.D. Ohio.

June 17, 2004.

Teresa Dewey Bacho, Toledo, OH, for Automated Handling, Metalfab Inc., and Jeffrey A. Miller.

Raymond L. Beebe, Toledo, OH, for Defendant.

## MEMORANDUM OPINION AND DECISION

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after a Trial on the Plaintiffs' Complaint to Determine Dischargeability. The Plaintiffs bring their complaint pursuant to 11 U.S.C. §§ 523(a)(2), (4) and (6). At the Trial, the Parties were afforded the opportunity to present evidence, and make any arguments that they wished the Court to consider in reaching its decision. This Court has now had the opportunity to review the arguments of counsel, the evidence presented at Trial, as well as the entire record in the case. Based upon that review, and for the following reasons, the Court finds that insufficient grounds exist to make a finding of nondischargeability. Accordingly, the Plaintiffs' complaint will be Dismissed.

## FACTS

The Plaintiff/Creditor, Jeffrey Miller and the Defendant/Debtor, Robert J. Knapik (hereinafter referred to as the "Debtor"), were formerly engaged in business together, operating under the corporate name of Automated Handling & Metalfab, Inc. (hereinafter "Automated"). Automated, who is a coplaintiff in this case, was formed jointly by Mr. Miller and the Debtor in the summer of 1992 when both men left their previous place of employment, Innovative Handling (hereinafter "Innovative"). While in business together, the Debtor held the position of President and Treasurer, while Mr. Miller held the title of Vice President and Secretary.

In starting their business together, both Mr. Miller and the Debtor relied upon certain proprietary information of their former employer, Innovative. In more detail, the Debtor took technical drawings while Mr. Miller took vendor and customer lists. The Debtor was also able to obtain a large account with a business known as Fiberlite, with whom he had maintained a working relationship while an employee of Innovative. In addition, it was pointed out that several employees of Innovative left the company to go work for Automated.

After several years of being in business together, problems of a personal nature arose between the Debtor and Mr. Miller. This eventually led, in accordance with a prior "Buy/Sell" agreement executed by the Parties, to Mr. Miller tendering and thereafter the Debtor accepting an offer from Mr. Miller to buy his interest in Automated for the sum of $200,000.00. As a part of this deal, the Plaintiffs were entitled to setoff against the purchase price the amount of any property or other

proprietary information taken from Automated. On January 13, 1997, this deal was consummated at Automated's place of business; at this time, but not before, the Debtor ceased his role with Automated as both an employee and a corporate officer.

Immediately after leaving Automated, the Debtor commenced employment with a company he had formed the month prior named Advanced Conveyor Systems, Inc. (hereinafter referred to as Advanced). In forming this new company, the Debtor, similar to both of the Parties' prior practices when leaving Innovative to form Automated, relied upon and utilized information and resources that were related to the operation of Automated. For simplicity sake, the types of information and resources utilized from Automated can be broken down into three different groups: (1) a computer disk containing backed-up drawings of project plans; (2) employees of Automated who left to go to work for the Debtor at Advanced; and (3) information concerning Automated's suppliers and customers. As it regards the latter, an important component of this case was that upon his departure—and even just prior thereto—Fiberlite began doing business with the Debtor's new business, Advanced. To a large measure this was a zero-sum game, with any gain in business enjoyed by Advanced coming at the direct expense of Automated, who in the ensuing months experienced a precipitous decline in business from Fiberlite.

On June 19, 2002, the Debtor filed a petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code. Prior to filing his petition, the Debtor sold his interest in Advanced to a newly formed business known as Advanced Metalfab, with whom the Debtor, although having no equity interest, continued to maintain an employment relationship. On February 19, 2004, the Trial on the instant matter was held.

## DISCUSSION

The matter before the Court is a determination as to the dischargeability of a debt. Pursuant to 28 U.S.C. § 157(b)(2)(I), this is a core proceeding over which this Court has been conferred with the jurisdictional authority to enter final orders. 28 U.S.C. § 1334.

Although no exact amount has yet been liquidated, it is the Plaintiffs' position that the Debtor's actions in leaving Automated—such as by taking project drawings, customers, and employees—give rise to a debt that is nondischargeable under one or all of paragraphs (2), (4) or (6) of § 523(a). Respectively, these sections provide:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

These exceptions to dischargeability help to implement the Congressional policy that bankruptcy is only for the honest, but unfortunate debtor. Yet, to also ensure that the Congressional policy in favor of providing a debtor with a fresh-start is furthered, the party moving for nondischargeability bears the overall burden of persuasion to establish the applica-

bility of each of these statutory exceptions to discharge. *Brandenberger v. Chinnery (In re Chinnery)*, 196 B.R. 836, 837 (Bankr.W.D.Mo.1996). For this purpose, a preponderance of the evidence standard is applied. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ Generally speaking, a common thread runs through all three grounds put forth by the Plaintiffs to establish the non-dischargeability of its unliquidated claim against the Debtor: the intent (or reckless disregard) to cause the harm committed. An act of defalcation, as excepted from discharge in paragraph (4) of § 523(a), however, is an exception to the rule, being defined, without reference to a debtor's state of mind, as simply the failure to adequately account for entrusted funds. *MPC Cash–Way Lumber Co. v. Collins (In re Collins)*, 266 B.R. 123, 128 (Bankr. N.D.Ohio 2000). In light of this lower standard of proof, the Plaintiffs put great emphasis on establishing the applicability of this exception to discharge.

■ Procedurally, the issue of defalcation was first submitted to the Court by the Parties on a Motion for Summary Judgment. This Motion, however, was denied on the basis that, even if an act of defalcation existed, insufficient evidence had been presented to establish a necessary condition precedent: under the express language of § 523(a)(4), a debt arising from an act of defalcation is only excepted from discharge if there also exists a "fiduciary relationship." In coming to his decision, this Court relied upon a series of cases issued by the Sixth Circuit Court of Appeals which adopted a narrow interpretation of the term "fiduciary capacity," holding that, in addition to a fiduciary relationship, there must also exist a specific res held in either an express or technical trust. *Carlisle Cashway, Inc. v. Johnson (In re John-*

*son)*, 691 F.2d 249, 251 (6th Cir.1982); *Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.)*, 760 F.2d 121 (6th Cir.1985); *R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176 (6th Cir.1997).

■ Looking now at the above legal standard in light of the evidence put forth at the Trial, it has been clearly shown that acts of defalcation have occurred; while an officer of Automated, the Debtor undertook actions which were knowingly detrimental to the company. *See Thompson v. Central Ohio Cellular, Inc.*, 93 Ohio App.3d 530, 540, 639 N.E.2d 462, 468 (1994) (under Ohio law, a corporate officer is generally a fiduciary to the shareholders). The difficulty again here, however, is the lack of proof concerning the existence of an express or technical trust so as to give rise to the fiduciary prerequisite of § 523(a)(4). In more detail, the record in this case is devoid of the necessary components comprising an express or technical trust: (1) an intent to create a trust; (2) an ascertainable trust res; (3) defined fiduciary duties; and (4) that the trust be imposed or come into existence prior to and without reference to the wrong which created the debt. *Ulmer v. Fulton*, 129 Ohio St. 323, 339–340, 195 N.E. 557 (1935); *N.P. Deoudes, Inc. v. Snyder (In re Snyder)*, 184 B.R. 473 (D.Md.1995). Thus, without the existence of a trust, the defalcation exception to discharge under § 523(a)(4) is not available to the Plaintiffs, causing the issue in this case to turn and become focused on the Debtor's intent.

In looking at his intent, it can be clearly gleaned from the facts of this case that the Debtor, in terminating his relationship with Automated and Mr. Miller, undertook actions that inured to his benefit while at the same time serving to harm the Plaintiffs. To reiterate, these self-serving acts involved the Debtor appropriating draw-

ings and customer/vendor lists from Automated; the Debtor convincing some of Automated's employees to switch employment to his newly formed corporation, Advanced; and causing Fiberlite, which had been a major account for Automated, to follow him to his new place of business.

■ Alone, however, the commission of such self-serving acts, despite any effect of harm, does not automatically lead to a finding of nondischargeability under any of the statutory exceptions to discharge cited to by the Plaintiffs; ergo, paragraphs (2), (4) or (6) of § 523(a). Instead, while each of these statutory exceptions to dischargeability is applicable in a slightly different context, their lowest common denominator is the same: scienter—that is, a specific intent to actually do the harm, whether it is an intent to defraud/deceive under § 523(a)(2), an intent to misappropriate another's property under § 523(a)(4); or the intentional injury to another's property under § 523(a)(6). *In re Stephens,* 51 B.R. 591, 595 (9th Cir. BAP 1985).

■ From an evidentiary standpoint, the existence of scienter is normally established by the use of circumstantial evidence, as opposed to direct evidence, given that a debtor is unlikely to admit the perpetration of a wrongful act. Although each situation is unique, helpful in this regard are some of the traditional indicia of fraud—e.g., suspicious timing of events, insolvency, transfers to family members or other insiders. *EDM Machine Sales Inc. v. Harrison (In re Harrison),* 301 B.R. 849, 855 (Bankr.N.D.Ohio 2003) (discussing the matter in the context of an action brought under § 523(a)(2)) In the end, however, such an analysis, as held by the Sixth Circuit, should not be one of "factor-counting," but rather an inquiry into whether all the evidence leads to the conclusion that it is more probable than not that the debtor acted with the requisite

intent. *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert),* 141 F.3d 277, 282 (6th Cir.1998) (again, discussing the matter in the context of an action brought under § 523(a)(2)).

■ When available, an examination of any agreement or understanding between the respective parties is a natural starting point in ascertaining the existence of an improper intent. Here, of significance, is the following provision of the Parties' Buy/Sell Agreement:

"[t]he selling shareholder shall be entitled to receive all personal property in his office[.] To the extent any of the items are the property of the Corporation, and not the personal property of the selling shareholder, the distribution of said items *shall be treated as compensation* to the selling shareholder."

(emphasis added). In giving this provision a reasonable interpretation, it can be concluded that the appropriation of corporate assets by the Debtor, besides being permissible, was specifically contemplated. Although the Debtor was required to treat appropriated property as compensation—which he admittedly did not do—the failure to comply therewith merely created a debt, not necessarily a nondischargeable debt. What is also contextually important here is what was not said in their business arrangement; the Parties did not set forth an agreement not to compete or otherwise not to disclose corporate trade secrets.

Putting things together then, since the utilization of corporate assets and resources, as opposed to being forbidden, was specifically permitted, no inference of fraud will arise simply because the Debtor utilized corporate assets and resources to his benefit, notwithstanding any negative consequences that later befell the corporation. In this regard, it is observed that scienter will not be inferred, especially in

the context of a business transaction, merely because a business deal is disadvantageous or otherwise one-sided. Further mitigating against the existence of any intentional wrongdoing on the part of the Debtor are the following considerations.

First, with regard to the Fiberlite account, it is the Plaintiffs' position that this account was stolen. Contrary to this position, however, the evidence shows that Fiberlite's loyalty was with the Debtor personally. As was stated by Mr. Ferguson, a principal of Fiberlite, at the Trial, "Where Bob [Debtor] went is where I took my work." Moreover, the testimony elicited at the Trial revealed that the Debtor was the person mainly responsible for maintaining and servicing the account with Fiberlite. The more logical conclusion, therefore, is that rather than "stealing" Fiberlite as a customer, Fiberlite simply chose, as customers are always free to do, to conduct its business with the Debtor and not Automated.

Second, Fiberlite had previously transferred its business to Automated when both the Debtor and the Plaintiff, Mr. Miller, left Innovative to form Automated. Thus, Mr. Miller is in this case complaining of acts that, in essence, he had previously practiced and condoned. The same is true for other acts the Plaintiffs now complain of—e.g., taking customer/vendor lists, employees. While past misconduct cannot be used to justify present misconduct, this state of affairs does lend credence to the conclusion that the Debtor's actions in leaving Automated, as opposed to being dishonest, were simply representative of a normal course of business dealing and practice between the Parties.

Finally, and measurably inconsistent with an intent to cause injury, there is no evidence in this case that the Debtor actually deprived Automated from the use of its property—whether it was drawings or customer/vendor lists. Instead, the Debtor simply made copies of these items, leaving the originals with Automated. Nor did the Debtor actively prevent the Plaintiffs from retaining customers, or for that matter employees. Rather, the Debtor simply offered a better deal to some of the Plaintiffs' customers and employees.

Therefore, based on the foregoing reasons, the weight of the evidence presented in this case does not support a finding that the Debtor acted with an intent to cause injury to the Plaintiffs as applied to paragraphs (2), (4) or (6) of § 523(a). Instead, the picture painted in this case is simply one of parties engaging in acceptable business competition. The well-established rule, however, is that in the absence of fraud or another explicit authority to the contrary, a court should not interfere with freedom of trade and general business competition. *See, e.g., Hyde Park Clothes v. Hyde Park Fashions,* 204 F.2d 223, 225 fn. 7 (2nd Cir.1953), *cert. denied* 346 U.S. 827, 74 S.Ct. 46, 98 L.Ed. 351 (1953).

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

**ORDERED** that any personal liability that the Debtor/Defendant, Robert Knapik, has to either of the Plaintiffs, Automated Handling & Metalfab, Inc. or Jeffrey A. Miller, be, and is hereby, determined to be a DISCHARGEABLE DEBT.

It is **FURTHER ORDERED** that the Complaint of the Plaintiffs, be, and is hereby, DISMISSED.